### III. CONCLUSION

Because we conclude that there was no manifest miscarriage of justice in Scott's trial or sentencing that would authorize us to issue a federal writ of habeas corpus countermanding the judgment of the Ohio courts, we REVERSE the order of the district court granting Scott's petition for a writ of habeas corpus; we AFFIRM the judgment of the district court in all other respects.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0138P (6th Cir.)
File Name: 00a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT



JAY D. SCOTT,
　　　*Petitioner-Appellee/*
　　　*Cross-Appellant,*

　　　*v.*

BETTY MITCHELL, Warden,
　　　*Respondent-Appellant/*
　　　*Cross-Appellee.*

Nos. 98-4272/4321

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-02037—Kathleen McDonald O'Malley, District
Judge.

Argued: January 24, 2000

Decided and Filed: April 19, 2000

Before: BOGGS, SILER, and BATCHELDER, Circuit
Judges.

_____

### COUNSEL

**ARGUED:** Stuart A. Cole, OFFICE OF THE ATTORNEY GENERAL OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellant. Timothy F. Sweeney, LAW

OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Stuart A. Cole, Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellant.    Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, John S. Pyle, GOLD, SCHWARTZ & CO., Cleveland, Ohio, for Appellee.

------------------

## OPINION

------------------

ALICE M. BATCHELDER, Circuit Judge.  Respondent Betty Mitchell ("the Warden") appeals the district court's grant of a writ of habeas corpus under 28 U.S.C. § 2254 to Ohio death row inmate Jay D. Scott.  The district court granted the writ on the basis of only one of the grounds raised in his petition, finding all of the other grounds either defaulted or meritless.  Scott cross-appeals the court's rejection of his remaining arguments.  After having the benefit of lengthy oral argument, and having given the careful consideration to the record and the parties' arguments that the gravity of the question before us demands, we are convinced that the district court erred in holding that the ground on which it granted the writ was not procedurally barred.  Because we conclude that the district court correctly held that the other grounds raised by Scott's petition were either defaulted or without merit, we will reverse the issuance of the writ.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual History

The facts of the underlying crime are not in significant dispute, except to the extent that Scott challenges the sufficiency of the evidence presented at trial to prove these facts.  The following summary is largely taken from the district court's Order, which in turn quoted it from the opinion of the Ohio Supreme Court.

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard [views evidence] in the light most favorable to the prosecution[, and] thus impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal quotations, citations and footnotes omitted).  This claim is not procedurally defaulted.

Scott argues that the evidence adduced at trial was insufficient to prove that he committed or attempted to commit aggravated robbery.  If true, this would invalidate his death sentence, as the only specification that made him death-eligible was "caus[ing] the death of another . . . while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit Aggravated Robbery."  To support his argument, Scott notes that nothing was taken from the V&E Delicatessen, that he entered the store with money, and that O'Neal testified that there had been no discussion of robbery before arriving at the store.

We agree with the district court and Ohio Supreme Court that ample evidence was presented to allow a rational jury to find Scott guilty of the specification:

[U]nder R.C. § 2911.01, [...] an attempt to commit armed theft constitutes aggravated robbery.  [...] This felonious objective is evidenced by the secretive manner in which Jones parked his car around the corner after dropping off [Scott] and O'Neal.  Of further relevance is the fact that [Scott] was aware of a pending robbery charge against him upon his apprehension.

*State v. Scott*, 497 N.E.2d at 64.  There is no ground here for habeas relief.

constitutionally required narrowing process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm." *Id.* at 246. Similarly, the Ohio Legislature "narrow[ed] the class of felony murders subject to the death penalty by excluding those who commit [murder in the course of an] arson, robbery, burglary or escape, unless they are charged with a different aggravating circumstance." *State v. Buell*, 489 N.E.2d 795, 807 (Ohio 1986); *see also* Ohio Rev. Code § 2929.04(A) (1996) ("Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment . . . and proved beyond a reasonable doubt:"). Scott fell within the narrowed category of death-eligible felony murderers because he committed or attempted to commit aggravated robbery. *See* Ohio Rev. Code § 2929.04(A)(7) (1996).

Moreover, even if an overlap were problematic, there is none here. Pursuant to Ohio Rev. Code § 2929.04(A)(7), Scott's indictment for aggravated murder added that "either [he] was the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation or design." The Ohio Supreme Court has held that this language is distinct from the definition of felony murder, because in addition to causing a death during a felony, the defendant must also be proved to have caused the death personally and directly[10] or in a premeditated manner. *See State v. Jenkins*, 473 N.E.2d 264, 280 n.17 (Ohio 1984); *State v. Barnes*, 495 N.E.2d 922, 925 (Ohio 1986) (per curiam).

### F. Sufficiency of the Evidence Used to Convict Scott

An habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking "whether, after viewing the evidence in the light most favorable to the

---

[10] In Ohio, the "principal offender" is the one who actually caused the death. S*ee Byrd*, No. 96-3209, slip op. at 5 n.2 (citing *State v. Penix*, 513 N.E.2d 744, 746 (Ohio 1987)).

On May 6, 1983, Vinnie Prince, owner and operator of the V&E Delicatessen at East 86th Street and Quincy Avenue in Cleveland, was shot and killed during an attempted robbery of her shop. An autopsy revealed that Prince died from a gunshot wound to the chest.

Octavia Hickman, who lived near the delicatessen, testified that on the day of the shooting, while walking back to her home after shopping at the nearby Sav-More Market, she noticed a greenish-blue Cadillac without a rear license plate pull up across from her house. She observed two black males inside the car, one behind the wheel and the other in the back seat. She later observed another black male come over a nearby fence and dive through the open window of the Cadillac. The car then drove away.

Another witness near the deli when the incident occurred was Clifford Roberson. Roberson was heading toward the store with a female companion when they heard a shot fired inside the store. He immediately grabbed his friend and pushed her up against the wall of the building, in an effort to protect her. When he heard a screen door slam, he turned around and saw two black males running from the store. Roberson testified that the taller man was about 5'11" tall, wearing "some type of rag around his head," and holding a long-barreled pistol. Upon opening the store's door, Roberson observed Prince lying "almost to the door as if she was trying to chase them or something." Roberson flagged down a nearby police car and informed the officers of the situation.

Solomon Smith, another witness to this incident, testified that he saw "two men run across the street, and run down to the corner of Mr. Cooper's house, and turn through the alley, and jump the fence." He described the assailants as two black males, one 5'10 ½" tall, the other "a little shorter." Smith did not observe anything in the fleeing men's hands.

Sometime after this incident, Detective Robert Moore received a telephone call from Ricky Tramble, and arranged to meet with him. Tramble testified that, at this meeting, he

informed Officer Moore that on the day Prince was killed, Tramble was with Edward O'Neal, Michael Streeter, Danny Jones, and Scott; they were all at O'Neal's girlfriend's house "to get high." Tramble said he overheard Scott say, "Well I did what I had to do. She shouldn't have made me move like that. F__k it. It's over with." Tramble testified that, later that day, Scott told Tramble, "[t]hese niggers don't know what they're doing. [T]hey get to crying about this and crying about that. This is what I do." Scott professed to Tramble that he was "a stick-up man." Tramble related further that the next day O'Neal informed him that Scott and O'Neal were involved in the V&E Deli incident, including the shooting of Prince.

On the basis of this information, the police apprehended and arrested Danny Jones and confiscated Jones's automobile, an older model, blue, turquoise-bottom Cadillac with a white top, bearing a thirty-day tag but no license plate. Jones signed a typewritten statement stating that he and O'Neal, Streeter, and Scott had been driving around looking for a place to rob. After selecting the V&E Deli as a target, Scott requested "front money" in order to fabricate a purchase, and asked for someone to go into the store with him. O'Neal finally agreed to accompany Scott into the store. At this time, Jones observed that Scott was armed with a .38-caliber pistol that looked like a police revolver, and O'Neal was carrying a .25-caliber automatic handgun. Jones pulled his car around the corner from the V&E Deli, and O'Neal and Scott got out of the car while Jones and Streeter waited for them. Shortly thereafter, Scott and O'Neal came running through a yard and climbed over a fence. O'Neal ran to the car and got in and Scott dived into the car through a window. Jones was told to "pull off." Later, Jones asked O'Neal what happened and O'Neal replied "that J.D. [Scott] shot her [...] cause she went for her [gun]." When Jones asked Scott if he had killed her, Scott replied, "naw she was still standing up when we ran out the door." At trial, Jones repudiated the part of his typewritten statement in which he acknowledged their intent to rob the V&E Deli, contending instead that Scott and O'Neal had gone into the store to get cold beer.

definition to not violate due process. We recently did the same in *Byrd*, No. 96-3209, slip op. at 65-66. Scott provides no reason to ignore this precedent.

### E.  Alleged Unconstitutionality of Ohio's Death-Penalty Scheme Facially and As Applied

Scott raised before the district court a number of reasons why the death penalty in general and in Ohio is unconstitutional. He focuses his argument on appeal only on two: that the fact that felony murder is used both as an element of the offense and a ground for capital sentencing fails to narrow the class of persons eligible for the death penalty, and that electrocution is cruel and unusual punishment. The rest are incorporated by reference in a footnote. The great majority of these incorporated issues, and the electrocution issue, were mentioned and rejected summarily in *Byrd*. *See* No. 96-3209, slip op. at 66-67. We will do the same, for substantially the same reasons expressed in the district court's Order. Although *Byrd* also rejected the claim that Ohio fails to narrow the class of death-eligible convicts, it did not explicitly address Scott's ground for this argument. Hence, it merits brief discussion here.

The Warden has not argued that Scott's argument on the overlap of felony murder between the underlying crime and aggravating circumstance is procedurally defaulted, and the district court dismissed it on the merits. Even if Scott were right that the same act was the basis of his conviction and aggravating circumstance, this alone would not justify habeas relief. *See Lowenfield v. Phelps*, 484 U.S. 231, 244-46 (1988). There, the Supreme Court instructed that aggravating circumstances are not ends unto themselves, but simply one means by which a state may perform the narrowing function. *See id*. at 244. *Lowenfield* upheld the Texas death-penalty scheme, in which the narrowing function was performed by the legislature when it circumscribed the range of offenses eligible for the death penalty. *See id*. at 245-46. "The fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the

accomplice instruction that required the jury to look for additional corroboration, just not in the language he proposed. There is no error here, much less one justifying a writ.

## 2. Definition of Reasonable Doubt

The trial judge read Ohio's statutory definition of reasonable doubt to the jury, which included the phrase "firmly convinced," and added some concluding remarks that essentially repeated the same language:

> Now, the Legislature of Ohio has specifically established the legal meaning of the term "reasonable doubt," and I will read that definition to you: "Reasonable doubt is present when, the jurors, after they have carefully considered and compared all evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based upon reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or dependent upon moral evidence is open to some possible or imaginary doubt.
> "Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his affairs."
> All of the evidence should be examined carefully and conscientiously by you, and, if after a full and impartial consideration of all the evidence, you are firmly convinced beyond a reasonable doubt of the truth of the charge or charges, then the State has proved its case and you must find the defendant guilty.
> If you are not firmly convinced of the truth of the charge, then the State has not proved its case and you must find the defendant not guilty.

Scott claims that this definition unconstitutionally conflates the reasonable doubt standard with the less demanding "clear and convincing" standard.

The district court correctly relied on *Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983), which held this precise

The police also apprehended O'Neal, who also gave them a typewritten statement. O'Neal stated that he, Jones, Streeter and Scott were driving around in Jones's Cadillac. They stopped in front of the V&E Deli because Scott told them he wanted to get some bologna and crackers. O'Neal followed Scott into the store. Scott asked for bologna and crackers and, when the old woman minding the store turned to obtain them, Scott pulled out a pistol. Scott told the woman to "freeze" and when the woman began to "holler" and "yell," Scott fired a single shot at the woman, striking her. O'Neal related that he was momentarily stunned by this occurrence and it was not until Scott grabbed him and pulled him out of the store that he began to run. They jumped the fence and ran to the car. O'Neal stated that he did not see the old woman in the store reach for a weapon.

At trial, O'Neal's testimony differed somewhat from this written statement in that he testified it was he—rather than Scott—who ordered the bologna and crackers in the store. O'Neal further testified that he was unarmed throughout this ordeal and that it was Michael Streeter who had the .25-caliber weapon in his possession while waiting in the car. O'Neal confirmed that he had talked with Tramble about what happened at the V&E Deli.

Barbara Campbell, a trace-evidence analyst with the Cuyahoga County Coroner's Office, testified that the results of a "Walker Nitrate Test" revealed that the muzzle of the gun which killed Prince was approximately 12 inches from her body when it was fired. Campbell further testified that a trace metal test conducted on the victim's hands indicated that Prince did not handle or fire a weapon prior to her death. Detective David Hicks, however, testified that Prince had a fully loaded .38-caliber revolver on her person when she was found.

On May 17, 1983, the grand jury returned its indictments. Scott was apprehended six months later in Philadelphia by Detective James Svekric of the Cleveland Police Department. During the trip back to Cleveland, Scott inquired who was

using his name in connection with a homicide *and robbery*. Up to that point, the arresting officers had informed Scott only that he was wanted in connection with a homicide; they had made no mention that Scott was also charged with aggravated robbery. Scott maintained that he had been in Reading, Pennsylvania, when the incident occurred.

## B. Procedural History

Scott and his three accomplices[1] were indicted by the Cuyahoga County Grand Jury on two counts: (1) aggravated robbery in violation of Ohio Rev. Code § 2911.01, and (2) aggravated murder in violation of Ohio Rev. Code § 2903.01. The grand jury added two specifications to the murder count: (1) a death-penalty specification for violation of Ohio Rev. Code § 2929.04(A)(7),[2] and (2) a firearm specification for violating Ohio Rev. Code § 2941.141.

Scott pled not guilty, proceeded to trial, and was convicted. The trial court then held a sentencing hearing as prescribed by Ohio Rev. Code §§ 2929.022(A) and 2929.03, and the jury recommended the death penalty. The trial judge adopted the recommendation and sentenced Scott to death for his murder conviction. Scott was also sentenced to 7-25 years of imprisonment for his aggravated robbery conviction and 3 years of imprisonment for the firearm specification.

---

[1] O'Neal, Jones, and Streeter each pled guilty to robbery offenses and received shock probation and/or suspended sentences.

[2] This section provides a death-penalty-qualifying specification if

The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

Ohio Rev. Code § 2929.04(A)(7) (1996).

defense significant enough to be cognizable on post-conviction review.

Nor did the court err in refusing Scott's accomplice instruction. In *United States v. Carr*, 5 F.3d 986 (6th Cir. 1993), an appellant challenged the trial court's refusal to give anything more than a general instruction on judging witness credibility. In dismissing the argument, we said

The court's instruction adequately informed the jury regarding the credibility of witness testimony, and so we are not troubled simply because the court chose not to explicitly highlight the credibility problems inhering in accomplice testimony. The instructions alerted the jury to the various considerations that it should take into account in weighing testimony, and it had an ample basis for rejecting the testimony of the accomplice witnesses if it had chosen to do so. In short, because the instructions given by the court substantially covered the same material as the instruction requested by the defendant, there was no reversible error.

*Id.* at 992. We have since followed *Carr* in not requiring accomplice instructions as a general matter, a rule that is significantly less favorable to defendants than the approaches of some of our sister circuits. *See*, *e.g.*, *United States v. Hill*, 627 F.2d 1052 (10th Cir.1980) (finding reversible plain error when no accomplice instruction was given and no other evidence corroborated the accomplice testimony); *United States v. Davis*, 439 F.2d 1105 (9th Cir.1971) (same); *Tillery v. United States*, 411 F.2d 644 (5th Cir.1969) (same); *United States v. McCabe*, 720 F.2d 951, 956 (7th Cir. 1983) (holding lack of accomplice instruction to be error when corroborating evidence was insufficient "to overcome the inherent unreliability of accomplice testimony"); *United States v. Lee*, 506 F.2d 111, 120 (D.C. Cir.1974) (holding failure to give instruction harmless because accomplice's testimony was "materially corroborated"); *United States v. Williams*, 463 F.2d 393, 396 (10th Cir.1972) ("considerable evidence" corroborated the accomplice's testimony). Scott received an

an abnormal fear of imprisonment since he was already incarcerated at the time. The Ohio Supreme Court also relied on *Howard* in rejecting Scott's appeal. *See State v. Scott*, 497 N.E.2d 55, 63 (Ohio 1986). We have never directly followed or contradicted *Howard*, although we have acted consistently with it by dismissing a claim of error for failure to produce any evidence that the witnesses were addicted at trial. *See United States v. Freeman*, Nos. 91-1011, 91-1012, 1991 WL 203088, at **3 (6th Cir. Oct. 4, 1991) (unpublished). Instead, in an unpublished opinion, when an appellant challenged the refusal to give a similar instruction for a witness who was an addict-informer but not addicted at trial, we relied on our authority governing addict-informer instructions. *See United States v. Anderson*, Nos. 97-5352, 97-5382, 1998 WL 833701, at **4 (6th Cir. Nov. 20, 1998). "This court has long recognized the importance of an addict-informant instruction in appropriate cases." *United States v. Brown*, 946 F.2d 1191, 1195 (6th Cir.1991). However, there is no per se rule requiring such instructions to be given in all cases involving addict testimony; instead, "the need for such an instruction depends on the circumstances of each case." *Id.* (internal quotation omitted). The district court errs by failing to give a requested instruction only when the requested instruction is correct, not substantially covered by the actual jury charge, and when not giving the instruction would substantially impair defendant's defense. *See United States v. Sassak*, 881 F.2d 276, 279 (6th Cir.1989).

We agree with the district court, and adopt the reasoning of *Howard*. It is certainly consistent with our handful of unpublished decisions on the issue, none of which has been receptive to requiring the addict instruction, and it is sensible; there is no reason to believe that Tramble's former drug use impaired his testimony at trial. But Scott's argument is lacking even under our prior case law. The requested instruction is correct, as it is remarkably similar to the Sixth Circuit pattern instruction for addict-informers. But the trial court's instruction to consider the witnesses' motives should have been sufficient, and there was no impairment to Scott's

Scott timely appealed his convictions and death sentence. Both were affirmed by the Ohio Court of Appeals and the Ohio Supreme Court. The United States Supreme Court denied Scott a writ of certiorari, though Justices Marshall and Brennan filed a dissenting opinion. *See Scott v. Ohio*, 480 U.S. 923, 923 (1987).

Scott then secured a stay of execution and petitioned the Cuyahoga County Common Pleas Court for post-conviction relief pursuant to Ohio Rev. Code § 2953.21. The Warden successfully moved to dismiss, but the Ohio Court of Appeals reversed the dismissal in part and remanded for a hearing on the issue of whether Scott was denied effective assistance of counsel at the mitigation phase of the sentencing hearing. Both parties unsuccessfully appealed this ruling to the Ohio Supreme Court, and the case was returned to the common pleas court for the hearing. At the conclusion of the hearing, at which Scott's family members and trial counsel testified, the trial court issued findings of fact and conclusions of law to the effect that Scott had not been denied effective assistance in the mitigation phase of his sentencing. Specifically, the court found that trial counsel's testimony was more credible than that of Scott's family members, that Scott and his family were primarily to blame for their failure to provide mitigating evidence, and that the "residual doubt" strategy pursued in the mitigation hearing was in Scott's best interest. Scott unsuccessfully appealed, and was denied a writ of certiorari on the ineffective assistance of counsel issue by the United States Supreme Court.

In addition to these post-conviction proceedings, Scott also pursued post-conviction relief pursuant to *State v. Murnahan*, 584 N.E.2d 1204, 1209 (Ohio 1992), which allows appellants claiming denial of effective assistance of appellate counsel to seek relief by applying for delayed reconsideration in the Court of Appeals, or by filing a delayed appeal directly with the Ohio Supreme Court. Scott first filed a motion to reopen his appeal in the Ohio Court of Appeals, which was denied. The Ohio Supreme Court affirmed, denied rehearing, and the United States Supreme Court denied certiorari. Scott also

filed a delayed direct appeal with the Ohio Supreme Court, which was refused.

The Ohio Supreme Court, on the Warden's motion, set October 25, 1995, as the date for Scott's execution. On September 20, 1995, Scott filed a notice of intent to file a habeas petition with the federal district court. The district court granted an indefinite stay of execution while Scott pursued his federal habeas relief, and appointed Scott's current counsel.

Scott's petition presented twenty-one grounds for relief, divided into three categories: (1) constitutional violations tainting the entire course of the state court proceedings (Grounds 1-6); (2) constitutional violations prejudicing Scott during specific stages of the proceedings (Grounds 7-19); and (3) constitutional violations relating generally to the Ohio death-penalty scheme (Grounds 20-21). Scott requested leave to conduct discovery and an evidentiary hearing, but both were denied for failure to show good cause. The court also made clear that because Scott filed his petition before the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), it would not apply the demanding standards of review mandated by that statute.

The court heard lengthy oral arguments from both parties and received post-hearing briefs on certain issues. On September 30, 1998, the court issued its opinion denying habeas relief on all grounds except one: Ground 18, which challenged the trial court's penalty-phase jury instruction regarding unanimity of the sentencing recommendation.[3] Scott was granted a certificate of appealability to cross-appeal the denial of the remaining grounds, and both sides filed timely notices of appeal.

---

[3]In its Order, the district court felt "compelled to mention" that Cleveland attorneys Timothy F. Sweeney and John S. Pyle, serving pursuant to the Criminal Justice Act, have done an exceptional job defending Scott. They have also performed commendably on appeal.

substantial and injurious effect or influence on the verdict, and are subject to harmless-error analysis.[9]  *See Gilliam v. Mitchell*, 179 F.3d 990, 994-95 (6th Cir. 1999) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

Also as with the challenge to the unanimity instruction, the State claims that both of these claims are defaulted because they were not objected to contemporaneously. Scott has made no response. The district court reached the merits of the first instruction challenged here, relating to witness credibility, without discussing its potential default. Regardless of whether this claim was defaulted, it is easily disposed of on the merits. The court also correctly held the second ground, regarding the definition of reasonable doubt, not to be waived, because the Ohio Supreme Court itself said so in a later opinion that discussed Scott's case. *See State v. Van Gundy*, 594 N.E.2d 604, 607 (Ohio 1992).

### 1. *Instruction on Credibility of Addicts and Accomplices*

Tramble admitted being an addict when he gave his information to the police, and Jones and O'Neal also testified against Scott as accomplices. Scott proposed specific instructions on the particular unreliability of accomplices, and that the testimony of drug addicts should be "considered with great care" because of their constant need of drug money and abnormal fear of imprisonment. Instead, the court gave general instructions on the jury's duty to determine witness motivation and credibility, and instructed that accomplice testimony must be corroborated "by other credible, believable evidence."

The district court, relying on *United States v. Howard*, 590 F.2d 564, 570 (4th Cir. 1979), found no error in rejecting the addict instruction because there was no evidence that Tramble was still addicted at the time of trial, and could not have had

---

[9]Scott cites an Eighth Circuit case for the proposition that *Brecht*'s harmless-error test does not apply if the state courts did not conduct a *Chapman* harmless error test, but *Gilliam* squarely rejects this contention.

appropriate case could be . . . the result of a tactical, informed decision by counsel, completely consonant with his duties to represent the accused effectively"). Without effective research into the available mitigating testimony, of course, it would be impossible for the lawyers to have made an informed decision either way, even if residual doubt was a viable option in retrospect. If we were to hold Scott's lawyers to be ineffective, then, it would have to be on the grounds of their failure to research mitigating evidence, not their failure to present it. Otherwise, there would be merit to the district court's concern in this case that to condone the lawyers' performance would be to create a post-hoc exception for faulty lawyering. Regardless, the Constitution guarantees competent counsel and a fair trial, not perfection. In light of the finding of the state common pleas court's evidentiary hearing that the lawyers' testimony is more credible than that of Scott's family, and that Scott's criminal history would have been known to the attorneys even without further research, we believe that the decision of Scott's attorneys to pursue a residual-doubt strategy in this case was not objectively unreasonable, because it was adequately (if not ideally) informed and was quite arguably the best course of action available.

### D.  Cumulative Error From Two Allegedly Erroneous Guilt-Phase Jury Instructions

As noted above, to warrant habeas relief, jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *See Coe*, 161 F.3d at 329. This burden is even greater than that required to demonstrate plain error on direct appeal. *See Frady*, 456 U.S. at 166; *Henderson*, 431 U.S. at 154 ("The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction by itself is undesirable, erroneous, or even universally condemned" (citations and internal quotations omitted)). Allegations of "trial error" raised in challenges to jury instructions are reviewed for whether they had a

Before this court, Scott defends the district court's reasoning that the unanimity instruction could have had the impermissible effect of causing one or more jurors to believe that unanimity was required not only as to the net weight of the mitigating factors versus the aggravating factors, but also as to the existence of each mitigating factor. The Warden, on the other hand, maintains that Scott's challenge to this instruction is procedurally barred from habeas review for failure to lodge a contemporaneous objection to the instruction in the trial court, and that, in any case, the instruction had no such effect on the finding of mitigating factors. Scott's cross-appeal further argues that (1) two other penalty-phase instructions, namely those telling the jury to ignore considerations of mercy in reaching its decision and advising that its recommendation of death would not be binding on the court, were unconstitutional; (2) Scott was prejudiced by comments made by the trial judge to the jury venire regarding media coverage of Prince's shooting and Scott's involvement in it; (3) Scott's trial counsel were ineffective in the penalty phase for failing to interview or present witnesses in mitigation and instead pursuing a residual doubt strategy; (4) the cumulative effect of two allegedly erroneous jury instructions violated Scott's due process rights; and (5) Ohio's death penalty is unconstitutional on its face and as applied to Scott for a variety of reasons. We will address each of these issues in turn.

## II.  ANALYSIS

When reviewing a district court's disposition of a petition for a writ of habeas corpus filed before AEDPA's effective date, we presume primary, or historical, factual findings by the state courts to be correct, rebuttable only by clear and convincing evidence under one of the eight conditions listed in the pre-AEDPA version of 28 U.S.C. § 2254(d)(1-8). *See Byrd v. Collins*, No. 96-3209, slip op. at 35 (6th Cir. Apr. 6, 2000) (citing *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996)). We review de novo determinations involving matters of law or mixed questions of law and fact. *See Mapes*

*v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). We afford "complete deference to evidence-supported state court findings of fact. [...] But the more substantive standard by which our *de novo* review is conducted is the determination whether the trial errors asserted by the petitioner resulted in a trial so devoid of fairness as to have amounted to a denial of the due process guaranteed by the fourteenth amendment." *Lundy v. Campbell*, 888 F.2d 467, 469 (6th Cir. 1989) (citing *Sumner v. Mata*, 455 U.S. 591 (1982) (per curiam)).

## A. The Trial Court's Penalty-Phase Jury Instructions

Because the state claimed that nearly half of Scott's claims, including his challenges to the penalty-phase jury instructions, had been procedurally defaulted, the district court began its legal analysis with a discussion of the law of procedural default, including a discussion of *Wainwright v. Sykes*, 433 U.S. 72 (1977), *Coleman v. Thompson*, 501 U.S. 722 (1991), and *Maupin v. Smith*, 785 F.2d 135 (6th Cir.1986), this circuit's seminal case applying the law of procedural default in federal habeas cases in which the state argues that an habeas claim is barred by the petitioner's failure to observe a state procedural rule. *Maupin* laid out a 4-part test that, as the district court correctly noted, we have consistently applied[4] since its issuance:

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule,

---

[4] The *Maupin* test is essentially a group of enumerated factors that is identical to the approach subsequently endorsed by *Coleman*: that the cause and prejudice/actual innocence test is to be applied in all federal habeas cases where the state court decision is based on an independent and adequate state ground. *See Coleman*, 501 U.S. at 750. Although we have remained faithful to the analysis endorsed by *Maupin*, our more recent decisions have not always employed a "*Maupin* test" per se. *See*, *e.g.*, *Byrd*, No. 96-3209, slip. op. at 53-54 (articulating the factors from *Maupin* and related cases differently but analogously); *Jones v. Toombs*, 125 F.3d 945, 946 (6th Cir. 1997) (applying the *Coleman* formulation without mentioning *Maupin*, although reaching the same result). In this case, however, we find it useful to follow *Maupin*'s enumerated factors.

It was their responsibility to present Scott's defense, not Scott's family's or even Scott's. In *Glenn v. Tate*, 71 F.3d 1204, 1207-08 (6th Cir. 1995), we held lawyers' conduct to be objectively unreasonable when they waited until after the verdict to prepare for the sentencing phase, failed to interview any family members or friends, and conducted no research at all into mitigation except to prepare one inadmissible videotape. We followed *Glenn* in *Austin v. Bell*, 126 F.3d 843, 848-49 (6th Cir. 1997), to find a lawyer ineffective when he failed to investigate or present any mitigating evidence despite the availability and willingness of several relatives and friends. We characterized counsel's performance there as not a "strategic decision, but rather an abdication of advocacy." *Id.* at 849; *see also Byrd*, No. 96-3209, slip op. at 63 (following *Austin* and *Glenn*)); *O'Guinn v. Dutton*, 88 F.3d 1409, 1424 (en banc) (Merritt, C.J., concurring) (finding attorneys' near-complete failure to investigate or present mitigating evidence, because each attorney thought the other was preparing it, to go beyond ineffectiveness into total incompetence). In *Mapes*, we remanded for a hearing on the effectiveness of appellate counsel, in part because he failed to raise the fact that the sentencing phase counsel conducted no research into mitigating factors.

Scott's penalty-phase attorneys would certainly have been well-advised to conduct more research into mitigating factors than they did. Unlike in *Austin* and *O'Guinn*, however, these lawyers had a credible reason for not presenting testimony: a desire to keep Scott's extensive criminal history from the jury. *See also Byrd*, No. 96-3209, slip op. at 63-64 (same). The state trial and appeals courts found this strategy to be in Scott's best interest, given his claim of actual innocence throughout trial and sentencing and the magnitude of his criminal past. Moreover, both the Ohio and United States Supreme Courts have endorsed a residual doubt strategy when warranted by the circumstances. *See Lockhart v. McCree*, 476 U.S. 162, 181 (1986) (recognizing the strategy as "an extremely effective argument for defendants in capital cases" (citation omitted)); *State v. Johnson*, 494 N.E.2d 1061, 1065 (Ohio 1986) ("omission of [mitigating] evidence in an

could not come close to rebutting with clear and convincing evidence. Moreover, while acknowledging the questionable amount of research done by counsel, the court decided that the second *Strickland* prong could not be met because Scott could not show a "reasonable probability" that the sentence would have been different otherwise. *Strickland*, 466 U.S. at 694. The court ended its discussion, however, with a footnote, noting that this too was a close call since one juror might always have been persuaded, and that the question was ultimately mooted by the court's grant of the writ on another ground.

The district court was correct to focus on the second *Strickland* prong. It is clear that, in its words, the "mitigating circumstances Scott wishes his counsel had presented . . . are largely, even overwhelmingly, negated by evidence that his background includes commission of robbery, assault, kidnaping, and other violent acts upon innocent citizens," and that prosecutors would have elicited such information from any family members who testified for Scott. The mitigating evidence would have revealed Scott's personal loyalty to his siblings, girlfriend, and children, and an exceedingly violent environment throughout his upbringing. As the district court said, it is impossible to say for certain that one juror would not have been swayed by this evidence, but certainty is not required here; we must ask only whether Scott has met his burden of demonstrating a reasonable probability that this would happen. None of the proffered mitigating evidence reduces Scott's culpability for the Prince murder or the string of violence that preceded it. Scott can only offer a hypothetical juror, not a reasonable probability, and hence cannot show prejudice.

As to the first *Strickland* prong, were we to reach it, it is not clear that the lawyers' performances fell below the objective standard. The state court fact findings that we are bound by indicate that neither Scott nor any proposed witness made any attempt to assist the attorneys in finding mitigating evidence, and that this made the job more difficult. This difficulty, of course, does not excuse a lack of attempt on the lawyers' part.

the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. [...] Second, the court must decide whether the state courts actually enforced the state procedural sanction. [...] Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. [...] This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. [Fourth], the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Id.* at 138 (citations omitted). For purposes of the procedural-default analysis, the district court grouped Scott's eighteenth ground for relief—the claim that the penalty-phase jury instruction on unanimity is unconstitutional—with his challenges to two other penalty-phase jury instructions—that the jury's recommendation of death was not binding on the trial court (Ground 14) and that the jury was to disregard emotions of mercy or sympathy (Ground 16)—because no contemporaneous objection to any of the three instructions had been raised. The district court noted that Scott had raised these three arguments for the first time on direct appeal. The Ohio Court of Appeals noted the default and plain error standard of review, but went on to address the merits of the claims. *See Scott*, 1985 WL 9047 at *8. The Ohio Supreme Court more explicitly relied on the procedural default, but nonetheless allowed for the possibility that Scott could prove plain error. The Ohio Supreme Court conducted a lengthy review of the record for plain error as to Ground 14, and a shorter review as to Ground 16. As to the unanimity instruction claim, however, the Ohio Supreme Court said only this:

Appellant next argues that the requirement of unanimity in recommending a life sentence denies a capital defendant his right to a fair trial and freedom from cruel and unusual punishment.

Again, appellant neglected to object to the trial court's instruction in this regard and has accordingly waived any objections with regard to this alleged error. *State v. Fanning*, *supra*. More importantly, in *State v. Jenkins*, [...], this court ruled that a jury's recommendation of a life sentence under R.C. 2929.03(D)(2) must be unanimous.

*State v. Scott*, 497 N.E.2d 55, 69 (Ohio 1986).

The district court concluded that none of these three claims had been procedurally defaulted. The court first noted that in examining Scott's fourteenth and sixteenth grounds and "arguably in examining Scott's eighteenth ground, as well," the Ohio Supreme Court had not simply relied on Ohio's contemporaneous-objection rule, but had conducted a plain-error analysis; hence, the Ohio Supreme Court "did not wholly overlook Scott's procedural default." Relying on an unpublished decision of this circuit, *Knuckles v. Rogers,* No. 92-3208, 1993 WL 11874 (6th Cir. Jan 21, 1993) (per curiam), the district court further concluded that in any event, Ohio's contemporaneous-objection rule is not an adequate and independent state ground on which the state could rely to foreclose review of these claims because that rule is not independent of federal law.

### 1. The Trial Court's Penalty-Phase Instruction on Jury Unanimity

With regard to Scott's challenge to the penalty-phase unanimity instruction—the only ground on which the district court granted the writ—we hold that the district court erred. It is undisputed here that the first *Maupin* prong has been established; Scott does not question the applicability of Ohio's contemporaneous-objection rule and he does not claim to have made such an objection. Scott does not address in this appeal the fourth *Maupin* prong, the cause and prejudice

The district court found all but one of the several grounds for ineffectiveness of his trial counsel that Scott raised before it to be procedurally barred, and Scott does not pursue those defaulted allegations on appeal. The sole remaining argument is that Scott's sentencing-phase counsel were ineffective because they failed to research possible mitigating factors, and also failed to interview Scott's several family members who often attended the trial. Scott's attorneys did not present any mitigating evidence other than Scott's own unsworn statement to the jury.[8] They pursued a "residual doubt" strategy, in which the defendant appeals to the jury's lingering doubt regarding the conviction in an attempt to dissuade them from imposing the death penalty. The state trial court held a post-conviction evidentiary hearing on this issue, and determined that: (1) trial counsel's testimony was more reliable than that of the family members; (2) the intransigence of Scott and his family was responsible for his counsel's failure to identify and obtain mitigating evidence from the family members; (3) the family members made no attempt to offer assistance until after Scott's conviction; and (4) had Scott chosen to have a pre-sentence investigation report prepared or had the family members testified, the jury would have learned of Scott's extensive criminal history. The court also made two other mixed findings of law and fact, namely that the family's testimony was unreliable and unhelpful and that Scott's lawyers acted in his best interest. The district court appropriately acknowledged its deference to the hearing's findings on the primary, historical facts, which Scott

---

[8]Scott had the right under Ohio law to testify under oath or make an unsworn statement to the jury, and he chose the latter. Scott used this opportunity to continue to deny his guilt ("I feel insulted, and that's what I wanted to reflect to you. Insult when you charged me."), and explicitly told the jury that he was not going to tell them any reasons that they should show him mercy since he was not guilty and that was all they needed to know ("I don't have to sit here and say 'Give me mercy.' What I mean, I don't want no mercy . . . I don't care what they say out of they [sic] mouths, and I'm telling you, it is me now talking for me . . . . I didn't care that you found me guilty, but it was up to you. I felt you couldn't because the truth has got to rise, but . . . you did, and it don't scare me when they say you are going to give me the death penalty.").

unless there is an "overwhelming probability" that they were ignored. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987).

Scott's scenario of jury bias is not nearly tenable enough to overcome these presumptions. Scott and Justice Marshall cited *Quercia v. United States*, 289 U.S. 466 (1933), for the proposition that the judge's comments warped the jury's perception beyond all hope of repair. The extremity of that case's facts, however, provide a perfect foil to demonstrate the mildness of the instant case. In *Quercia*, the trial judge instructed the jury that he believed every word the defendant said to be a lie because the defendant had wiped his hands while on the stand. *See id*. at 468-69. Here, we have only Scott's inference that the court's facially innocuous statement may have been understood as a "frank, unguarded admission" of the judge's opinion, which would then have a prejudicial effect on a juror's verdict. All we know for certain is that the court communicated the existence of pretrial publicity, which *Patton* held not to be an indelible influence on a juror's mind. *See also United States v. Peters*, 754 F.2d 753, 762-63 (7th Cir. 1985) (recounting several studies demonstrating capital jurors' ability to put media reports out of their minds and vote exclusively on the evidence). This alone does not destroy fundamental fairness.

## C. Ineffective Assistance of Trial Counsel During the Penalty Phase

We apply to this claim the same de novo standard listed above. For Scott's counsel to have deprived him of his Sixth Amendment right to effective assistance, the counsel's performance must have "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). It is Scott's burden to show his attorneys' performance fell below an objective standard of reasonableness and that Scott was thereby prejudiced. *See id*. at 687-88. Counsel's performance is strongly presumed to be effective. *See id*. at 690; *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

test, although the district court did address that issue. Rather, Scott focuses on the second and third *Maupin* prongs, arguing that the Ohio courts did not actually enforce the state contemporaneous-objection rule and that the rule is neither an adequate nor an independent state ground.

### (a). The Second **Maupin** *Prong – Application of the Rule*

The determination of whether a state court decision was based on a state procedural rule is a legal question that we review de novo. *See Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991) (per curiam). Scott argued to the district court that by conducting a plain-error review, the Ohio Supreme Court had excused the procedural default and hence had not enforced the state procedural sanction. The district court did not entirely agree: "It is questionable whether the Ohio Supreme Court truly overlooked Scott's procedural defaults and examined the merits of Scott's three grounds regarding jury instructions. [...] A plain error analysis is not tantamount to a review on the merits, so the Ohio Supreme Court did not wholly overlook Scott's procedural default."

On appeal, Scott cites the Supreme Court's holding in *Harris v. Reed*, 489 U.S. 255, 257 (1989), that federal habeas courts are to apply the "plain statement rule" of *Michigan v. Long* to determine whether a state court decision was based on a state law ground, and that any ambiguity as to whether the holding was based on or intertwined with federal law requires the application of the *Long* rule. Scott urges us to find that the Ohio Supreme Court decided his challenge to the jury unanimity instruction on its merits, not on the basis of the procedural bar, citing as evidence the fact that in its three-sentence disposition of this claim, the Ohio Supreme Court began the last sentence with the words "More importantly."

Scott's argument is meritless. The issued addressed in *Harris*, as we explain below in relation to the third *Maupin* factor, is whether the state court decision actually relies on a state procedural ground that is both adequate and independent from federal law; *Harris* does not preclude a finding that the state procedural rule was actually enforced where the state

court decision also relies on an alternative ground. Scott's only arguable basis for asserting that the Ohio Supreme Court did not enforce the contemporaneous-objection rule is its "More importantly" sentence. The district court viewed this sentence as only "arguably"amounting to a plain error review, and did not accept Scott's argument that this was the primary holding. We conclude that the Ohio Supreme Court's adversion to Ohio's substantive law regarding jury unanimity with regard to the recommendation of a life sentence was not even arguably a plain error review, but was simply a supplement to its holding that Scott had waived any objection to the jury instruction by failing to object at the time the instruction was given.

### (b). The Third Maupin Prong – Adequate and Independent State Ground

Scott claims not only that the Ohio Supreme Court did not enforce the contemporaneous-objection rule and hold his challenge to the unanimity instruction barred; he claims that because the contemporaneous-objection rule does not preclude the state appellate courts from performing a plain-error review, the rule itself is dependent on federal law and is therefore not an "independent and adequate state ground" under *Maupin*. Here the district court agreed. For support, it turned to our unpublished decision in *Knuckles v. Rogers*, No. 92-3208, 1993 WL 11874, at **2-3 (6th Cir. Jan. 21, 1993) (per curiam):

> [I]t is clear that Ohio has a contemporaneous objection rule, and that the Ohio courts treat the failure to object to a claimed error as a procedural default. Ohio R. Crim. P. 52; *State v. Williams*, 304 N.E.2d 1364 (Ohio 1977). Since Knuckles failed to object contemporaneously to the allegedly improper remarks, he violated Ohio's contemporaneous objection rule and committed a procedural default. However, the procedural default did not foreclose all consideration by the Ohio appellate court; the Ohio court examined the record to determine if the allegedly improper remarks were "plain error."

in response to evidence presented at trial. In this context, we have said

> It is the duty of the trial judge to conduct an orderly trial with the goal of eliciting the truth and attaining justice between the parties. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. The district judge may not assume the role of a witness. He or she may, however, analyze and dissect the evidence, as long as the district judge does not distort or add to it. When commenting on the evidence, the trial judge must take great care to avoid undue prejudice of the jury.

*United States v. Blakeney*, 942 F.2d 1001, 1013 (6th Cir. 1991) (citations, quotations and alterations omitted). Hence, the judge did not exceed his authority merely by pointing out the existence of the article and discussing its contents as a basis to judge juror impartiality.

Allegations of jury bias must be viewed with skepticism when the challenged influence occurred before the jurors took their oath to be impartial. Holding that pretrial publicity did not bias a juror in *Patton v. Yount*, 467 U.S. 1025, 1036 (1984), the Court said that the partiality of a juror "is plainly a question of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." Accordingly, the Court held that such a determination by a state court was entitled to a presumption of correctness on habeas review under 28 U.S.C. § 2254(d). This is especially so in light of the two curative instructions the court gave, which we must presume to have been effective

## B. The Trial Judge's Comments to the Jury Venire

We examine this claim de novo, with deference to facts found in state court, for denial of fundamental fairness. It is not procedurally barred.

Scott challenges a remark made by the trial judge which he claims communicated to the jury the court's belief that Scott participated in the crime. During voir dire, the judge explained to the jury that the court knew there was notoriety surrounding the case because he had seen a newspaper article on it. The judge mentioned some details of the crime, then continued, "Not only was Mr. Scott – at least from the newspaper reports that I think I had read – was involved in this, there were three other--. . . ." At that point, the defense objected, and received a sidebar. The Court gave a curative instruction explaining the court's lack of knowledge on the case beyond the article. Scott moved for a mistrial, which the prosecution reluctantly joined. Denying the motion, the Court gave another instruction reiterating its neutrality and the jury's duty to decide based solely on the evidence.

Dissenting from Scott's denial of certiorari, Justices Marshall and Brennan lambasted the Ohio courts for upholding such an "extraordinary error" that "overwhelmed the presumption of innocence." *Scott v. Ohio*, 480 U.S. at 925. They also pointed out that empaneling another jury would have been easy at the voir dire stage. For this reason and because the prosecutor joined the mistrial motion, the district court found this issue a "close call." Nonetheless, the court found no fundamental unfairness. It viewed the comments as reporting to the jury the media's conclusion, and the fact that even the judge had seen the coverage, in an attempt to determine the jury's ability to be impartial. It concluded by noting that the verdict would likely have been upheld under Supreme Court precedent even if the jury themselves had read the article.

We find no error in the district court's conclusion. The threat of prejudicial comments from the court usually arises

The basic inquiry in the plain error analysis in Ohio is whether the defendant has been denied a "fair trial." Whether a person is denied a fair trial is a question to be resolved by applying principles of federal constitutional law. Therefore, we conclude that the Ohio appellate court's decision was not independent of federal law.

(footnote omitted). The district court concluded that "[g]iven the reasoning in *Knuckles*, this court must conclude that Ohio's application of its contemporaneous objection rule in this case was not independent of federal law." For the reasons that follow, we hold that the district court erred in holding that the Ohio Supreme Court's dismissal of this claim does not rest on an adequate and independent state ground.

In the recent published opinion in *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998), this circuit addressed the issue of whether a federal habeas court is required to disregard a state court's finding of procedural bar because the state court also issued an alternative holding. We explained in *Coe* that, in contrast to the state court's statements in *Harris* that the state had a "well-settled" principle of law that issues which could have been raised on direct appeal but were not are considered waived, and that petitioner's claim "could have been raised in [his] direct appeal," *id.* at 330 (quoting *Harris*, 489 U.S. at 258 (alteration in original)), the state court in *Coe* "took things one step further, . . . and explicitly and clearly said that Coe had no cognizable claim. There was, therefore, a sufficiently clear and express statement here." *Id.* at 330-31. It is *Coe* that governs our analysis here.

*Knuckles*, on the other hand, is an unpublished opinion, and therefore is not binding upon subsequent panels of the court. *See* 6 Cir. R. 206 (1998). And, in any event, in *Knuckles* we did not hold that Ohio's contemporaneous-objection rule or the Ohio court's application of that rule was not independent of federal law; rather, we held that in that case the Ohio court's decision that there was no plain error was not independent of federal law.

Here, the district court itself acknowledged that its "adequate and independent state ground" analysis was "more tenuous" with regard to the unanimity instruction than the other two claims, because "the Ohio Supreme Court did not clearly apply a plain error analysis to Scott's eighteenth ground . . . "[5] As we have indicated, however, the concluding sentence in the relevant Ohio Supreme Court passage simply did not amount to any type of review, much less one dependent on or intertwined with federal law.

More importantly—and we use that term advisedly—*Harris* specifically instructed state courts that they

need not fear reaching the merits of a federal claim in an *alternative* holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. Thus, by applying this doctrine to habeas cases, *Sykes* curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision. In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

*Harris*, 489 U.S. at 264 n. 10 (citations omitted). Further, the Supreme Court instructed in *Coleman* that "[a] predicate to the application of the *Harris* presumption is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law." *Coleman*, 501 U.S. at 735. As *Coleman* makes very clear, to apply *Harris* any more broadly would eviscerate the very foundations of the adequate and independent state ground doctrine, which are

---

[5] The court alleviated this concern by finding that the Warden also failed the fourth *Maupin* prong, the cause and prejudice test. That conclusion was also erroneous, as we will address below.

duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality, without bias, sympathy or prejudice, so that the State of Ohio and the defendant will feel that their case was fairly and impartially tried.

We rejected a challenge to the substance of this instruction in *Mapes* as well:

Third, an instruction to a death-sentence jury that it may disregard the statutory criteria for imposing a death sentence may be constitutionally impermissible in light of the probability that such an instruction would result in arbitrary and unpredictable results. *See California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). According to the Court, "sentencers may not be given unbridled discretion in determining the fates of those charged with capital offenses." *Id*. Thus, an instruction that the jury should not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was not only unobjectionable in *Brown*, it "serve[d] the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on [irrelevant,] extraneous emotional factors." *Id.* at 542, 543, 107 S.Ct. 837. Thus, there is no merit whatsoever to Mapes's claimed entitlement to a "merciful discretion" instruction, in light of the likely tendency of such an instruction to lead to arbitrary differences in whom is selected to be sentenced to death.

171 F.3d at 415-16 (emphasis omitted, alterations in original). The district court also correctly relied on *Brown*, reasoning that the instruction followed that decision by warning against all emotional responses, both in favor of and against Scott. There was no error as to this instruction either.

1982), any error was waived. As was the case in *Coe*, the state court's statement could have been clearer and more express, but the test is not whether the state court could have said it better. It is enough that the court specifically held that the claims were waived; the court's alternative holding that there was no plain error "does not require us to disregard the state court's finding of procedural bar." *Coe*, 161 F.3d at 330.

We further conclude, however, that the district court correctly determined that neither of these claims had merit. The trial judge instructed the jury that its recommendation of death would be "just that – a recommendation," while a recommendation of life imprisonment "is binding upon the Court, and I, the Judge, must impose the specific life sentence which you recommend." Scott claims that this violates the principle established in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), that courts must not mislead the jury into believing it has less responsibility than it actually does for choosing the death sentence.

We recently rejected this precise claim in *Mapes v. Coyle*, 171 F.3d 408, 414-15 (6th Cir. 1999). Moreover, as the district court correctly held, *Caldwell* is limited to situations in which the jury is misled as to its role "in a way that allows [it] to feel less responsible than it should for the sentencing decision. Thus, to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (citations and alterations omitted); *see also Dugger*, 489 U.S. at 407; *Kordenbrock*, 919 F.2d at 1101. As *Mapes* points out, this instruction accurately describes Ohio law. There is no error with regard to this instruction.

The trial court also instructed the jury:

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence to decide all disputed questions of fact, to apply the instructions of the Court to your findings, and to render your verdict accordingly. In fulfilling your

federalism, finality and comity. *See id.* at 730-32, 738-39, 749.

The state court decision in the case before us here relied more obviously on adequate and independent state procedural grounds than did the state court decision in *Coleman* itself. There, the Virginia Supreme Court granted the state's motion that requested summary dismissal purely on state procedural grounds, although the court's use of the phrase "[u]pon consideration whereof [referring to the parties' briefs]" suggested that the court may have considered the merits of the filings as well. *Coleman*, 501 U.S. at 728. The Supreme Court refused to read this ambiguity as "overriding the court's explicit grant of a dismissal motion based solely on procedural grounds. Those grounds are independent of federal law." *Id.* at 744.

Nothing in the Ohio Supreme Court's analysis with regard to the unanimity instruction suggests that the court relied on federal law. That court explicitly said that Scott had waived the error by failing to object at trial, and that it had previously interpreted a state statute to require unanimity anyway. There is no mention of a plain-error analysis, and not even a hint that federal law played a role in dismissing this claim. And the Ohio Supreme Court's concluding sentence in ruling on the unanimity instruction, even if it could be viewed as related to federal law, was in addition to and separate from its explicit holding on state procedural grounds.

Finally, in *Engle v. Isaac*, 456 U.S. 107, 124-29 (1982), the Supreme Court specifically found that default imposed for failure to object contemporaneously as required by Ohio's Rule 30 is an adequate and independent state ground to bar federal habeas review absent a showing of cause and prejudice. In so holding, the Court specifically rejected Scott's argument:

Relying upon *State v. Long*, [...] respondents argue that the Ohio Supreme Court has recognized its power, under Ohio's plain-error rule, to excuse Rule 30 defaults. *Long*, however, does not persuade us that the Ohio courts

would have excused respondents' defaults. First, the *Long* court stressed that the plain-error rule applies only in "exceptional circumstances," such as where, "but for the error, the outcome of the trial clearly would have been otherwise." [...] Second, the *Long* decision itself refused to invoke the plain-error rule for a defendant who presented a constitutional claim identical to the one pressed by respondents.

*See id.* at 125 n. 27. In *Coleman*, the Court also very strongly implied its continued disapproval of the rule the district court here ascribes to *Knuckles*. As a preamble to its discussion of independent state grounds, the Court acknowledged that it had previously held that Oklahoma's review for "fundamental trial error" before applying state procedural defaults "was not independent of federal law so as to bar direct review because the State had made application of the procedural bar depend on an antecedent ruling on federal law." *Coleman*, 501 U.S. at 741 (citing *Ake v. Oklahoma*, 470 U.S. 68 (1985)) (quotations and alterations omitted). The *Coleman* Court then distinguished that holding by observing simply that "*Ake* was a direct review case. We have never applied its rule regarding independent state grounds in federal habeas. But even if *Ake* applies here, it does Coleman no good because the Virginia Supreme Court relied on an independent state procedural rule." *Id.* The Supreme Court, then, does not find the mere reservation of discretion to review for plain error in exceptional circumstances sufficient to constitute an application of federal law. Neither Scott nor *Knuckles* points to any change in Ohio law that could distinguish *Engle* or *Coleman* from the present case, and as in Ohio's *Long* case that *Engle* cites, the Ohio Court here did not invoke its plain-error review for this claim.

We issued a similar ruling in *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989). There we enforced a default for failure to object contemporaneously in a Michigan court, although the state courts reserved the right to excuse the default for "manifest injustice." We noted that

on that jury, *id.* at 1040, its requirement of an explicit instruction that "a solitary juror may prevent a death penalty recommendation" was prospective only; *Brooks* did not hold that all instructions requiring unanimous recommendations of life or death in previously decided Ohio death-penalty cases were unconstitutional. *See id.* at 1042. There is nothing in the *Brooks* opinion to cast doubt on the Ohio Supreme Court's previous approval of Scott's sentence (or, for that matter, Mapes's). As we have explained, our *Coe* decision, which well preceded *Mapes*, explicitly held that unanimity instructions like those in this case do not violate *Mills*. The *Mapes* dicta cannot preclude us from following *Coe* in this case.

We further note that the district court was clearly incorrect in finding error in the trial court's failure to advise the jury in its unanimity instruction as to the consequences of deadlock. The Supreme Court has chastised such instructions as encouraging deadlock and undermining the strong governmental interest in unanimous verdicts. *See Jones v. United States*, 119 S.Ct. 2090, 2099-2100 (1999). We did the same in *Coe*, 161 F.3d at 339-40.

### 2. The Trial Court's Penalty-Phase Instructions Regarding Considerations of Mercy and Effect of Recommendation of Death

As with the challenge to the unanimity instruction, the State claims that Scott's challenges to these two jury instructions are defaulted because Scott made no contemporaneous objection. The district court held that these claims had not been procedurally defaulted because the Ohio Supreme Court had performed a plain-error review of each of them. The district court determined, however, that the claims were without merit.

We think that the district court erred in holding that these claims were not procedurally defaulted. As to each of them, the Ohio Supreme Court explicitly stated that Scott had failed to raise any contemporaneous objection, and under its precedent of *State v. Fanning*, 437 N.E.2d 583, 585 (Ohio

mitigating factors." This instruction pertains only to the weighing process, and not to the existence of individual mitigating *or* aggravating factors. Indeed, the instruction references these factors in the past tense, which suggests that the jurors were to have formed their opinions on the factors' existence before attempting to reach unanimity on their net weight. As in *Coe*, "[n]othing in this language could reasonably be taken to require unanimity as to the presence of a mitigating factor." 161 F.3d at 338. Whether or not the district court was correct that the instruction violated Ohio law by not conforming with the Ohio Supreme Court's subsequent decision in *Brooks* (which we find doubtful, given that court's approval of Scott's sentence), it does not violate Scott's federal constitutional rights under *Mills* and therefore cannot justify habeas relief.

Our conclusion is not altered by the portion of the opinion in *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), which suggests that such unanimity instructions are erroneous. In that Ohio capital case, we reviewed a similar challenge to a virtually identical unanimity instruction. *See Mapes*, 171 F.3d at 416 ("[Y]ou must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors."). We stated in dicta that this instruction was erroneous because *Brooks* had found such instructions to violate the Eighth and Fourteenth Amendments, but we declined to issue a writ on this ground because the petitioner had procedurally defaulted that claim. *See id*. at 416-17, 419. The only reliance on federal constitutional law in *Brooks*, however, is its citation to *Mills* in explaining why it would thenceforth require that Ohio jurors be explicitly instructed that "a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." *Brooks*, 661 N.E.2d at 1042. Although the *Brooks* case was remanded for resentencing because the Ohio Supreme Court could not be sure of the effect that the instruction to "determine unanimously that the death penalty is inappropriate before you can consider a life sentence" had

[w]e would be loath to adopt an exception to the "cause and prejudice" rule that would discourage state appellate courts from undertaking the sort of inquiry conducted by the Michigan court, and we do not believe that the state court's explanation of why the jury instructions resulted in no manifest injustice can fairly be said to have constituted a waiver of the procedural default.

*Id.* at 285. Although this statement appears addressed more towards the determination of whether the state courts actually enforced the bar (*Maupin*'s second prong) instead of its independence from federal law, the reasoning is equally applicable to this discussion.

All in all, we think it is clear that *Knuckles*, an unpublished decision of this court, cannot provide persuasive authority to support a finding that the Ohio Supreme Court did not rely on an independent state procedural ground in disposing of Scott's challenge to the trial court's penalty-phase instruction on jury unanimity.

In addition to his claim that Ohio's contemporaneous-objection rule is not independent of federal law, Scott also argues that it is not "adequate" because it is not consistently enforced. The Supreme Court has held that an independent state rule must be firmly established and regularly followed in order to be adequate. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *Byrd v. Collins*, No. 96-3209, slip op. at 53 (6th Cir. Apr. 6, 2000) (following *Ford*). Scott claims that the Ohio Supreme Court has retained "unfettered discretion" to waive the rule and has been "remarkably inconsistent" in applying it. He points to cases where the court ignored potential defaults and dismissed on the merits. In *State v. Zuern*, 512 N.E.2d 585, 592 (Ohio 1987), the capital defendant raised his nine constitutional challenges to the state's death penalty statute by a general oral objection rather than by a specific motion. The Ohio Supreme Court held that although this technically constituted waiver under Ohio law, "because of the nature of the case and the exacting review necessary where the death penalty is involved, [it] reserve[d]

the right to consider the constitutional challenges in particular cases." *Id.* This somewhat relaxed approach to reviewing a claim that was raised, but in an incorrect manner, is a separate matter entirely from Scott's complete failure to object contemporaneously. In *State v. Hamblin*, 524 N.E.2d 476, 479 (Ohio 1988), the capital defendant raised in the appellate court two grounds for ineffective assistance of counsel, and added three new grounds in the Supreme Court. Although the new grounds were technically waived, the court said that "[b]ecause this is a capital case, we will review all five arguments relating to the claim of ineffective assistance of counsel." *Id.* As was the case in *Zuern*, *Hamblin* did not involve a completely forfeited issue. In *State v. Williams*, 528 N.E.2d 910, 914 (Ohio 1988), the Court observed that "[b]ecause of the gravity of the sentence that has been imposed on appellant, we have reviewed the record with care for any errors that may not have been brought to our attention. In addition, we have considered any pertinent legal arguments which were not briefed or argued by the parties." Despite this observation, the court affirmed the sentence and did not discuss any specific error that the parties had not raised. None of these cases involved the contemporaneous-objection rule. Finally, in *State v. Coleman*, 544 N.E.2d 622, 627 (Ohio 1989), the court did apparently waive the default resulting from the defendant's failure to object contemporaneously to a jury instruction: "However, since this is a capital case we have reviewed the jury instructions and find not only that there was a correct statement of the law but also that the trial court additionally instructed the jury it could not convict the defendant of aggravated murder unless it found [specific intent to kill]."

These cases do indicate that the Ohio Supreme Court employs an abundance of caution in capital cases, and, on occasion, has relaxed its enforcement of default. They do not, however, indicate that Ohio reserves so much leeway in capital cases that we are justified here in ignoring its sovereign decision founded upon its own procedural rule. In cases where state procedural grounds have not been enforced by federal courts because they were not firmly established and

or more mitigating circumstances, the sentence shall be life imprisonment.

For both the death verdict and the life imprisonment verdict, the jury was told that its verdict must be unanimous.

*Id.* at 337 (alterations in original). As in this case, the district court in *Coe* found this instruction to be unacceptable under, *inter alia*, *Mills*, "because there was a reasonable probability that the jurors believed that they could consider only those mitigating circumstances that they unanimously agreed were present." *Id.* *Coe* upheld the instruction because requiring unanimity only as to the results of the weighing process "is a far different matter than requiring unanimity as to the *presence* of a mitigating factor . . . . The instructions say clearly and correctly that in order to obtain a *unanimous verdict*, each juror must conclude that the mitigators do not outweigh the aggravators." *Id.* at 338 (emphasis in original). In this regard, *Coe* specifically distinguished that instruction from those at issue in *Mills*, 486 U.S. at 387 (reviewing a verdict form that read "Based upon the evidence we unanimously find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist by a preponderance of the evidence and each mitigating circumstance marked 'no' has not been proven by a preponderance of the evidence" (emphasis omitted)), and *Kubat*, 867 F.2d at 369 ("If . . . you unanimously conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the verdict form which so indicates."), which much more clearly required unanimity in the finding of mitigating factors.

Similarly, Scott's jury was instructed to recommend death if it unanimously found "that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors," and to choose an appropriate life sentence if it was unanimous in finding "that the State of Ohio failed to prove that the aggravating circumstances which the defendant . . . was found guilty of committing, outweigh the

condemned by *Mills v. Maryland*, 486 U.S. 367 (1988). The district court saw the fact that a minority of this Court had followed *Kubat*, and the majority had merely distinguished it factually, in *Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990) (en banc), as evidence that we would follow *Kubat* here. Therefore, the court found a substantial possibility that the "faulty jury instruction which created this mis-impression violated Scott's Fourteenth Amendment right to be free from deprivation of life without due process of law."

We think that the court's likening of the instruction given here to those at issue in *Mills* and *Kubat* was incorrect. Those instructions required the jury to be unanimous in its finding of each mitigating factor, whereas this instruction plainly applies only to the overall weighing of mitigating and aggravating factors. In this regard, Scott's argument is indistinguishable from the one we recently rejected in *Coe v. Bell*, 161 F.3d 320, 336-39 (6th Cir. 1998). In that case,

The jury was then given the form its verdict should take:

(1) We, the Jury, unanimously find the following listed statutory aggravating circumstance or circumstances;
.  .  .  .  .
(2) We, the Jury, unanimously find that there are no mitigating circumstances sufficiently substantial to outweigh the [aggravating circumstances] so listed above.
(3) Therefore, we, the Jury, unanimously find that the punishment shall be death.

The alternate result was then provided for and explained:

If you unanimously determine that no statutory aggravating circumstance has been proved by the State beyond a reasonable doubt; or if the Jury unanimously determine that [aggravating circumstances] have been proved by the State beyond a reasonable doubt; but that said [aggravating circumstances] are outweighed by one

regularly applied, the facts have been much more extreme than these isolated examples of discretion. *See*, *e.g*, *Ford*, 498 U.S. at 423-24 (finding state rule governing timing of *Batson* challenges to racial makeup of jury not even remotely close to being "firmly established and regularly followed" because it was a novel rule applied retroactively); *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) (rejecting state court's explanation that petition was worded too generally to have raised an issue because that court had recently accepted an identically worded appeal); *Warner v. United States*, 975 F.2d 1207, 1213-14 (6th Cir. 1992) (rejecting Ohio Supreme Court's reliance on failure to raise ineffective assistance on direct appeal as reason for default because there was no such requirement at the time). Rather, this case is more like those in which some minor inconsistency in applying the rule has been noted but held not to be severe enough to override the federalism, finality and comity interests served by enforcing the bar. *See*, *e.g.*, *Coleman*, 501 U.S. at 758 (White, J., concurring) ("Petitioner argues that the Virginia court does in fact waive the rule on occasion, but I am not now convinced that there is a practice of waiving the rule when constitutional issues are at stake, even fundamental ones. The evidence is too scanty to permit a conclusion that the rule is no longer an adequate and independent state ground"); *Dugger v. Adams*, 489 U.S. 401, 410 n. 6 (1989) ("respondent asserts . . . that the Florida Supreme Court has failed to apply its procedural rule consistently and regularly because it has addressed the merits in several cases raising *Caldwell* claims on postconviction review. In the vast majority of cases, however, the [court] has faithfully applied its rule that claims not raised on direct appeal cannot be raised on postconviction review"); *Byrd*, No. 96-3209, slip op. at 53-54 (following *Dugger* in holding that four examples of waiver of default by Ohio courts are not enough to overcome the vast majority of cases enforcing the default); *Coe*, 161 F.3d at 331 ("The few [cases that are not adverse or too old to be relevant] are isolated and unpublished, and so are . . . insufficient to defeat an otherwise 'strict and regular' practice"); *Shepard v. Foltz*, 771 F.2d 962, 966 (6th Cir. 1985) ("we [recently] questioned our prior determination whether Michigan enforces a

contemporaneous objection rule with respect to *Sandstrom* violations, and, in any event, we held that a federal habeas petitioner must meet the *Sykes* test if the Michigan courts in fact applied such a rule").

Application of the adequate and independent state ground doctrine in this case also requires an assessment of the specific state interest served by enforcing the contemporaneous-objection rule. *See Wesselman v. Seabold*, 834 F.2d 99, 101 (6th Cir. 1987) (noting that resolution of this prong "turns on the substantiality of the state interest involved"); *Maupin*, 785 F.2d at 138 (same). This consideration reinforces the need to enforce the procedural default here, because the contemporaneous-objection rule has been lauded as few other procedural requirements have been. Not only did the Court expressly endorse Ohio's Rule 30 in *Engle*, but the sweeping language of cases such as *United States v. Frady*, 456 U.S. 152 (1982) (raising the issue under the Federal Rules), suggests that the Court places high importance on the contemporaneous-objection rule regardless of jurisdiction:

> Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

*Id.* at 165-66 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). Perhaps nowhere, however, has this conviction been stated more strongly than in *Sykes*:

> The contemporaneous-objection rule itself is by no means peculiar to Florida, and deserves greater respect than *Fay* gives it, both for the fact that it is employed by a coordinate jurisdiction within the federal system and for *the many interests which it serves in its own right. A contemporaneous objection enables the record to be*

*State v. Springer*, 586 N.E.2d 96, 97 (Ohio 1992) (syllabus), the court held that when the jury became hopelessly deadlocked as to sentence, the court is required to impose a life sentence. In *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996), the court reviewed a sentencing instruction that the jury must unanimously agree that the death penalty is inappropriate before recommending a life sentence. The court found this contrary to § 2929.03(D)(2). *See id.* at 1040-41. *Brooks* purported to "harmonize" the *Jenkins* and *Springer* holdings by requiring an instruction to be given thenceforth that a solitary juror could prevent the imposition of the death penalty. *See id.* at 1041-42. The district court found it "notable" that *Springer* and *Brooks* were decided after Scott's sentence was imposed, but decided that *Brooks* had simply clarified, not altered, Ohio law on the subject. It thus found the trial court's instruction requiring unanimity on life to be inconsistent with Ohio law.

Since "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief," *see Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991), the district court went on to observe that the "instructions left no room for the jury to believe the court could accept anything other than a unanimous recommendation, and gave no direction to the jury as to the effect a jury split would have on the jury's prior determination of guilt, or on the sentence the trial court could or would then impose on Scott." The court then followed *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989), which found a similar instruction to create the impermissible possibility that individual jurors would believe that unanimity was required as to the existence of mitigating factors, the result

---

open court." *Id.* This rule was available to Scott's trial court. Even without this rule, moreover, the *Jenkins* court found that any potential ambiguity in the unanimity instruction was resolved by the "well-recognized [rule] that when statutes allow a jury in a criminal proceeding to influence punishment, such as the recommendation of life imprisonment in place of death, and the statute fails to expressly authorize a nonunanimous vote, the jury cannot secure the lesser punishment absent unanimity." *Id.*

> *After you have retired, first, select a foreman or forelady and when all 12 of you – I repeat – all 12 of you agree upon a verdict, you will sign the verdict in ink, and advise the Court of this fact.* You will remain in the jury room until summoned back into the courtroom. When you return to the courtroom, your verdict will be returned to me, as you did before, and I will read it for you.

(emphasis added by district court). This was based on the following provision of Ohio law:

> If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender. *Absent such a finding*, the jury shall recommend that the offender be sentenced to [one of the following life imprisonment terms].

Ohio Rev. Code § 2929.03(D)(2) (emphasis added by district court). It was clear to the district court that the statute did not require unanimity in recommending a life sentence, but rather mandated life imprisonment if the jury reached anything but unanimity on death. The court also reviewed three decisions of the Ohio Supreme Court interpreting § 2929.03(D)(2). The first, *State v. Jenkins*, 473 N.E.2d 264, 270 (Ohio 1984) (syllabus ¶ 10), held that a jury's recommendation of life imprisonment under that section must be unanimous.[7] In

---

[7]The district court suggested in its Order that the *Jenkins* decision was available to the trial court when it sentenced Scott, but we think this is clearly wrong. Scott's sentencing-phase jury recommended the death penalty on March 28, 1984, and the court adopted the recommendation on April 4, 1984, but *Jenkins* was not released until December 17, 1984. Nevertheless, the Ohio Supreme Court approved of the unanimity instruction in *Jenkins* with such sweeping language as to suggest that the question was well-settled under Ohio law. *See Jenkins*, 473 N.E.2d at 307. The Court relied almost exclusively on Ohio Crim. R. 31(A), which provided: "The verdict shall be unanimous. It shall be in writing, signed by all jurors concurring therein, and returned by the jury to the judge in

---

*made with respect to the constitutional claim when the recollections of witnesses are freshest, not years later in a federal habeas proceeding. It enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question.* While the 1966 amendment to § 2254 requires deference to be given to such determinations made by state courts, the determinations themselves are less apt to be made in the first instance if there is no contemporaneous objection to the admission of the evidence on federal constitutional grounds.

*A contemporaneous-objection rule may lead to the exclusion of the evidence objected to, thereby making a major contribution to finality in criminal litigation.* Without the evidence claimed to be vulnerable on federal constitutional grounds, the jury may acquit the defendant, and that will be the end of the case; or it may nonetheless convict the defendant, and he will have one less federal constitutional claim to assert in his federal habeas petition. If the state trial judge admits the evidence in question after a full hearing, the federal habeas court pursuant to the 1966 amendment to § 2254 will gain significant guidance from the state ruling in this regard. *Subtler considerations as well militate in favor of honoring a state contemporaneous-objection rule. An objection on the spot may force the prosecution to take a hard look at its hole card*, and even if the prosecutor thinks that the state trial judge will admit the evidence he must contemplate the possibility of reversal by the state appellate courts or the ultimate issuance of a federal writ of habeas corpus based on the impropriety of the state court's rejection of the federal constitutional claim.

We think that the rule of *Fay v. Noia*, broadly stated, may encourage "sandbagging" on the part of defense lawyers, who may take their chances on a verdict of not guilty in a state trial court with the intent to raise their constitutional claims in a federal habeas court if their initial gamble does not pay off. *The refusal of federal habeas courts to honor contemporaneous-objection rules*

*may also make state courts themselves less stringent in their enforcement.* Under the rule of *Fay v. Noia*, state appellate courts know that a federal constitutional issue raised for the first time in the proceeding before them may well be decided in any event by a federal habeas tribunal. Thus, their choice is between addressing the issue notwithstanding the petitioner's failure to timely object, or else face the prospect that the federal habeas court will decide the question without the benefit of their views.

*The failure of the federal habeas courts generally to require compliance with a contemporaneous-objection rule tends to detract from the perception of the trial of a criminal case in state court as a decisive and portentous event.* A defendant has been accused of a serious crime, and this is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury. To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify. Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens. *Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.*

We believe the adoption of the *Francis* rule in this situation will have the salutary effect of making the state trial on the merits the "main event," so to speak, rather than a "tryout on the road" for what will later be the determinative federal habeas hearing. There is nothing in the Constitution or in the language of § 2254 which requires that the state trial on the issue of guilt or innocence be devoted largely to the testimony of fact witnesses directed to the elements of the state crime, while only later will there occur in a federal habeas

On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, other evidence, the statement of Jay Scott, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision.

In this event, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court. [...]

Now, ladies and gentlemen, let me, first of all, before we continue, before I read to you what your verdict is, you see it is almost identical, and when I say "It is almost identical," to the forms that you have received before. It says, and I just picked them up the way they were, "Sentencing Proceeding" on the top, and it identifies the case, the case number, and then it says, "Verdict: We, the jury in this case being duly empaneled and sworn, do find beyond a reasonable doubt that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are sufficient to outweigh the mitigating factors presented in this case.

"We, the jury, recommend that the sentence of death be imposed upon the defendant, Jay Scott," *and, again, signed by the foreman or forelady and all 12 of you must sign.*

The second form is: "We, the jury in this case being duly empaneled and sworn, do find that the aggravating circumstances which the defendant, Jay Scott, was found guilty of committing, are not sufficient to outweigh the mitigating factors present in this case.

"We, the jury, recommend that the defendant, Jay Scott, be sentenced to life imprisonment with parole eligibility after sentencing," and then there's a blank with an asterisk which refers down and says, "insert years of imprisonment," *and again, the signatures, and the first line is reserved for the foreman or forelady, and the remainder of the eleven of you must sign that verdict form. It must be unanimous.* [...]

sentencing phase of a capital trial. *See id*. The Court observed that although it would not attempt to define "what it means to be 'actually innocent' of a death sentence," *id*., it could not find such extraordinary injustice under the facts of that case, where the mitigating and aggravating factors had been found to be equal. *See id*. Scott has made no attempt to demonstrate this kind of fundamental miscarriage of justice, and we are confident that he cannot do so.

Accordingly, we hold that the district court erred in concluding that Scott's claim of constitutional error with regard to the penalty-phase unanimity instruction was not procedurally defaulted, and in further concluding that even if the claim were defaulted, Scott demonstrated cause and prejudice to excuse the procedural default. We further hold that the Ohio Supreme Court relied on Ohio's contemporaneous-objection rule—an adequate and independent state ground—in holding that this claim had been defaulted; that Scott failed to demonstrate cause and prejudice to excuse the default, and that the district court erred in reaching the merits of this claim. We therefore REVERSE the district court's issuance of a writ of habeas corpus.

### (d).  The Merits of Scott's Challenge to the Unanimity Instruction

Nevertheless, out of an abundance of caution and in order to clarify our precedents governing sentencing-phase instructions on jury unanimity, we will consider in the alternative the merits of Scott's challenge. The unanimity instruction given to Scott's jury read:

> *If all 12 members of the jury find*, by proof beyond a reasonable doubt, that the aggravating circumstances which Jay Scott was found guilty of committing outweigh the mitigating factors, then you must return such a finding to the Court. I instruct you as a matter of law that if you make such a finding, then you have no choice and must recommend to the Court that the sentence of death be imposed upon the defendant, Jay Scott. [...]

hearing a full airing of the federal constitutional claims which were not raised in the state proceedings. *If a criminal defendant thinks that an action of the state trial court is about to deprive him of a federal constitutional right there is every reason for his following state procedure in making known his objection.*

*Sykes*, 433 U.S. at 88-90 (footnote omitted, emphasis added). Certainly, Ohio's rule passes the third *Maupin* prong in this case.

### (c).  The Fourth Maupin Prong – The Cause and Prejudice Test

The district court's primary rationale for excusing procedural default as to the unanimity instruction claim was that Scott had shown cause and prejudice to excuse his failure to object. The court's only explanation of cause is that "Scott reasonably believed a contemporaneous objection would be futile" because, as demonstrated in the Ohio Supreme Court's three-sentence disposition of this claim, that court's precedent at the time required jury verdicts as to both guilt and life sentences to be unanimous. The United States Supreme Court, however, has explicitly rejected this idea:

> the futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial. If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid. Allowing criminal defendants to deprive the state courts of this opportunity would contradict the principles supporting *Sykes*.

*Engle*, 456 U.S. at 130 (footnotes omitted). Scott does not address cause and prejudice on appeal,[6] and even if he did he would be hard-pressed to distinguish this holding; it was made in the context of Ohio's contemporaneous-objection rule, and the Court has said "that the standard for cause should not vary depending on the timing of a procedural default or on the strength of an uncertain and difficult assessment of the relative magnitude of the benefits attributable to the state procedural rules [involved]." *Murray v. Carrier*, 477 U.S. 478, 491 (1986).

The district court's finding of prejudice was based on the merits of Scott's claim, and on its conclusion that the sentencing proceedings might reasonably have come to a different result absent the instruction of which Scott complains. Of course, evaluating the merits to determine the applicability of procedural default is circular and undermines the federalism concerns behind the doctrine. Moreover, while *Sykes* left open the definition of "prejudice," *Frady* "eliminate[d] any doubt about its meaning for a defendant who has failed to object to jury instructions at trial," *Frady*, 456 U.S. at 168:

> [*Henderson*] summarized the degree of prejudice we have required a prisoner to show before obtaining collateral relief for errors in the jury charge as "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." We reaffirm this formulation, which requires that the degree of prejudice

---

[6]Instead, Scott argues that even if we find procedural default, we should at least review his claim for plain error. The Supreme Court rejected precisely this contention in *Frady*, 456 U.S. at 164-65, noting that to apply the same "plain-error" review to a habeas petition that would apply on direct appeal destroys any respect for the finality of the state court judgment and allows the petition to function as a second appeal. The Court was very clear that the cause and prejudice test must be used instead.

resulting from instruction error be evaluated in the total context of the events at trial. As we have often emphasized[,] a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. Moreover, a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

*Id.* at 169 (internal quotations, citations, and alterations omitted). Presumably, this same approach applies to jury instructions in the sentencing phase as well. Our review of the briefs and record leaves us convinced that there is no such prejudice here. Scott offers no help in making that assessment, however, and, in any event, we find that Scott cannot show cause for his default.

Although neither the district court nor Scott mentions it, it is worth noting that an exception to the requirement that a federal habeas petitioner demonstrate cause and prejudice in order to obtain review of his defaulted claims may be made when the petitioner is able to demonstrate that failure to consider those claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Engle*, 456 U.S. at 135. The Court has explained that although, ordinarily, petitioners who can show a fundamental miscarriage of justice will also be able to meet the cause and prejudice requirement, in extraordinary cases, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496; *Dugger*, 489 U.S. at 410 n. 6. In *Dugger*, the Court noted that this exception will apply to death sentences only in extraordinary cases, given the difficulty of translating the concept of actual innocence from the guilt phase to the