*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0287P (6th Cir.)
File Name: 03a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

FUGEN GULERTEKIN,
    *Petitioner-Appellant,*

    *v.*

No. 01-3920

DEBORAH TINNELMAN-
COOPER, Warden,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 00-00808—James L. Graham, District Judge.

Argued: February 7, 2003

Decided and Filed: August 14, 2003

Before: SILER and ROGERS, Circuit Judges; GWIN,
District Judge.[*]

_____

[*] The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

_____

## COUNSEL

**ARGUED:** John P. Feldmeier, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, for Appellant. Diane Mallory, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** John P. Feldmeier, Marc D. Mezibov, SIRKIN, PINALES, MEZIBOV & SCHWARTZ, Cincinnati, Ohio, for Appellant. Diane Mallory, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

SILER, Circuit Judge. Petitioner-appellant Fugen Gulertekin appeals the district court's denial of her petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, we affirm the decision of the district court.

## BACKGROUND

Gulertekin's conviction arises from events which occurred on June 12, 1997. Gulertekin, a citizen of Turkey who holds a Master's Degree from Ohio State University in special education and early childhood education, was caring for Patrick Lape, a five-month-old infant, in her home. According to Gulertekin's testimony, in the early afternoon on that date, Gulertekin was changing Patrick's diaper before his nap when he began to choke and vomit. Patrick stopped breathing and Gulertekin administered first the Heimlich maneuver and then CPR. At some point she called for her thirteen-year-old daughter, who was also in the house, to call 911. The baby, however, started breathing again, so the call

was discontinued. A few minutes later, when Patrick again stopped breathing, Gulertekin called her daughter to renew the call to 911, and resumed her attempts at resuscitation.[1] Emergency personnel arrived and Patrick was taken to Children's Hospital in Columbus, Ohio. Upon his arrival, Dr. Carla Hauersperger (a pediatrician who examined and treated Patrick) diagnosed him with "a closed head injury, seizure, possible aspiration pneumonia, bilateral retinal hemorrhage and occipital skull fracture."

Gulertekin was indicted on one count of felonious assault and one count of child endangering. At trial, three physicians testified for the state. Dr. Hauersperger stated that she had suspected child abuse, based on Patrick's injuries, so she ordered the medical photographer for the hospital to come to the Emergency Department and take photographs of Patrick. Dr. Hauersperger also ordered several consultations of other physicians, including Dr. Charles Johnson, the director of the Child Abuse Division of the hospital. Dr. Johnson, who is also a professor of pediatrics at the Ohio State University College of Medicine and has published articles on shaken baby syndrome, testified as well. Dr. Johnson stated his opinion that the injuries to Patrick's brain occurred within minutes of the manifestation of his symptoms, that these injuries were caused by his being severely shaken, and that there was nothing in the history he had been given to indicate an accident. Dr. Elizabeth Gilles, a child neurologist at the hospital and an assistant professor of neurology and pediatrics at Ohio State University, also testified. Dr. Gilles has previously testified as an expert in pediatric child abuse and neglect, has written articles on shaken baby syndrome, and was called in as a consultant to examine Patrick several weeks

---

[1] The government asserts in its brief that "[a]t approximately 1:00 p.m., two 911 calls were placed from Gulertekin's home, both resulting in hang-ups. When the police dispatcher called back, Gulertekin's 13-year-old daughter answered the telephone and stated that a baby was choking." This account comports with the facts recounted by the Ohio Court of Appeals, in its opinion rendered on December 3, 1998.

after his injury. She testified that Patrick's injuries were probably sustained within one hour before the paramedics were called, and that they could not have happened by accident.

The jury found Gulertekin guilty of both offenses charged in the indictment. The court sentenced her to eight years imprisonment. She appealed her convictions to the Ohio Tenth District Court of Appeals, which affirmed on December 3, 1998. She then sought to appeal to the Supreme Court of Ohio, but it declined to accept jurisdiction over the direct appeal. She filed a petition for post-conviction relief with the trial court on September 17, 1998, one day after the 180-day deadline. The court dismissed the petition for lack of jurisdiction, due to the late filing. She appealed this dismissal to the Ohio Tenth District Court of Appeals, which affirmed. Gulertekin then filed a petition with the Ohio Supreme Court, requesting it to accept jurisdiction over her post-conviction appeal, but it was denied. She filed the current habeas petition with the federal district court on July 20, 2000, asserting six grounds for relief.[2] The district court dismissed the petition, finding that her claims were procedurally defaulted and that her claim of actual innocence was insufficient to excuse such default.

---

[2] These grounds were as follows:

(1) ineffective assistance of counsel; (2) denial of due process, a fair trial, and an impartial jury based on trial court's manipulative and coercive tactics toward a deadlocked jury; (3) denial of due process, a fair trial, and effective representation of counsel due to government's violation of the Vienna Convention on Consular Relations; (4) prosecutorial misconduct, concealment of exculpatory and mitigating evidence, and coerced incriminating statements; (5) denial of a fair trial and due process of law due to severe and prejudicial evidentiary errors by the trial court; and (6) actual innocence.

## STANDARD OF REVIEW

In a habeas proceeding, this court reviews a district court's legal conclusions *de novo* and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Further:

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "Whether a state court rested its holding on procedural default so as to bar federal habeas review is a question of law" reviewed *de novo*. *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000). This court looks to the last explained state-court judgment when answering that question. *Id.*

## DISCUSSION

### A.  Procedural Default

#### 1.  Juror Coercion

In her second claim on habeas, Gulertekin asserts that "her rights to due process, a fair trial, and an impartial jury. . .were violated when the trial judge effectively directed the jury to return a guilty verdict." This claim stems from a series of events which occurred during the jury's deliberations. The jury initially began deliberating at 1:00 p.m. on November 25, 1997. At 2:42 p.m. the jury was admonished and given a fifteen minute recess. The jury continued deliberating until 7:25 p.m., at which time they were admonished and recessed until the next morning. At approximately 9:45 a.m. on

November 26, 1997, the jurors submitted a note to the trial judge, asking, "What do you suggest when some jurors feel strongly one way, and one or two jurors feel strongly the other way?"

The judge noted that the same question had been posed by the jurors the day before, after they had been deliberating for less than two hours. The judge then gave the standard "*Howard* charge," and the jury returned to the jury room at 10:45 a.m. Shortly after 11:00 a.m., another note was sent to the trial judge asking whether one of the jurors could be replaced by an alternate juror. The note stated in part that Juror No. 3 "would like to be replaced because I am not able to reach the decision of everyone else."

At 11:20 a.m., the trial judge held a discussion with the attorneys for both sides, out of the presence of the jury. The judge expressed concern that Juror No. 3 was not deliberating, and further related that "[i]t's also come to my understanding from the bailiff that – I have seen her do this – that whenever they are on break she's on a cell phone. It is my understanding from the bailiff that she's called her boyfriend to come pick her up. She's not been excused from this jury." The judge then asked counsel what they wanted to do, and whether they wanted to excuse the juror, noting that "yesterday the comment was that she doesn't want to be the one responsible for making the decision in this case." In the discussion which ensued, the judge further expressed her intention to have the bailiff remove the juror's cell phone, because:

For her to call her boyfriend to come pick her up to me is communicating about the case. That's a violation of the oath. . . . It's now been brought to my attention that she's also called her mother yesterday, now she's calling her boyfriend to come pick her up. Maybe she's not talking about the substance of the case, but I don't think it's appropriate to have that cell phone back there so I'm going to ask the bailiff to take the cell phone.

The trial judge asked the attorneys whether they wanted to voir dire the juror, in chambers, in order to determine whether she was refusing to deliberate. Defense counsel stated his opinion that "it is inappropriate for us to intrude into the deliberating process" and that the court should not "creat[e] an intrusive atmosphere with regard to that juror." He suggested that the next step would be to ask the jury foreperson whether further deliberations would be productive and, if he answered in the negative, to declare a mistrial (to which the court stated that an insufficient period of time had elapsed since the giving of the *Howard* charge to declare a mistrial). Defense counsel then reiterated his objection to "pull[ing] one juror out of deliberations and interrogat[ing] them in the middle of deliberations." A further exchange occurred regarding the judge's concern that Juror No. 3 was not deliberating and her use of the cell phone, to which defense counsel responded, "Your Honor, the question and the answer, seem to me, do not infer juror misconduct. . . . My suggestion is, frankly, the answer to the question is no, she can't be removed." The remaining dialogue was as follows:

THE COURT:            Okay. Then what I'll tell her she can't be removed, hand over the cell phone. She's not allowed to have any contact with anyone out of the jury deliberation room regarding this case.

[DEFENSE COUNSEL]:   During the deliberations, or I don't know, you can get –

THE COURT:            Outside the process here. I don't want her on the breaks calling anybody saying come pick me up, I can't do this any more.

[DEFENSE COUNSEL]:   Well, I think you need to make it not just to her, but to all of the jurors.

THE COURT:            Bring them out here. We'll do that.

Upon the jury's entry into the courtroom, the judge read the note aloud, noted that it posed the same question as was submitted by the jury the day before, and stated:

Our response is still the same, you are all members of this jury. You have not been excused from this jury. I have given you the instructions. I have just given you additional instructions on how you are to conduct yourselves in the deliberation room. I'm telling you to go back there and deliberate on this case.

I would like anybody who has got a cell phone to turn it in to the bailiff. You are not allowed to have any communications concerning this case either in the deliberation room or outside of the deliberation room. The admonition that I have given you applies throughout the entire trial. The only time you are allowed to discuss this case is among yourselves while you are deliberating in the deliberation room. This also applies to calling anyone on the outside, such as a mother or boyfriend to come pick them up because that's not going to happen.

Now, I'm going to ask you to turn over the cell phones to the bailiff, go back into the deliberation room and continue your deliberations.

The jury was given the admonition and recessed during the noon hour; they resumed deliberations after lunch, and returned a verdict of guilty on both counts at 1:50 p.m. The jurors were polled, and each, including Juror No. 3, indicated that this was his or her verdict.

Gulertekin contends that the trial court's tactics amounted to juror coercion, and has presented an affidavit by Juror No.

3, Julie Weston Ring, which recounts her feelings that the judge's statements regarding the use of cell phones

> were directed solely at me, as I had previously used my cell phone to call my boyfriend during a break. In front of the entire courtroom, which was filled with spectators, news reporters and television cameras, I was then forced to turn over my cell phone to a man I believed to be the court's bailiff. I felt humiliated and degraded by the judge.

Ring further avers that the judge's "statements made me feel as though she was forcing me to change my position and compelling me to vote to convict Mrs. Gulertekin. The manner in which Judge O'Neill instructed us made me feel as though she was not going to let anyone leave until we had a conviction."

The district court found this habeas claim to be procedurally defaulted, due to the failure of Gulertekin's trial counsel to object to the judge's supplemental instructions, and thus declined to address the merits.[3] Gulertekin asserts, however, that the finding of a procedural bar is erroneous, because (1) Ohio Criminal Rule 30 (requiring

---

[3]We have previously held:

When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction. . . .Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (internal citations omitted).

contemporaneous objections to jury instructions) does not apply to jury instructions given after the jury begins its deliberations; (2) defense counsel did object to the trial court's resolution of the situation; (3) the court of appeals failed to provide a "clear and express" statement that it was enforcing the state procedural sanction at issue; and (4) this procedural bar does not constitute an independent and adequate state ground, separate from federal law. The district court rejected these arguments upon examination of the opinion of the Ohio Court of Appeals, dated December 3, 1998, the last state court to review the claim.

In reviewing this claim on direct appeal, the Ohio Court of Appeals first observed that defense counsel did not object to the *Howard* charge the court had initially given to the jury, and "further note[d] that no objection was raised to the court's final supplemental instructions which included the court's admonition to the jurors to 'go back there and deliberate on this case.'" The court then reviewed state law, holding that "in the absence of plain error, 'the failure to object to improprieties in jury instructions, as required by Crim. R. 30, is a waiver of the issue on appeal.'" Gulertekin's first argument, that Rule 30 is inapplicable to jury instructions given after the jury has begun to deliberate, relies on a single antiquated case, *Burnett v. State*, 19 Ohio Law Abs. 100 (1935), which held that a court's admonition to the jury to "try and reach a verdict" after deliberations had started was not an "additional charge . . . in violation of § 13442-9 GC." Neither Gulertekin nor *Burnett* explains the substance of § 13442-9 GC, so the import of this holding, thus removed from its context, is dubious. Moreover, while Gulertekin asserts that the state court never used the term "contemporaneous objection" in reference to the jury coercion claim, the court did state that "counsel failed to object to the

[supplemental] instruction given at the time." Therefore, this argument is without merit.[4]

Gulertekin further maintains that defense counsel's discussion with the trial judge, prior to the giving of the supplemental instruction, in which he voiced disagreement with the suggestion of singling out Juror No. 3, did constitute a contemporaneous objection to the judge's instruction – particularly to the court's admonition against jurors "calling anyone on the outside, such as a mother or boyfriend to come pick them up." Gulertekin seeks to distinguish the present situation due to the fact that defense counsel had no opportunity, before the jury was called in, to review the exact language the court intended to use in addressing them and lodge any objections. Although this factual scenario is somewhat unique, it is by no means unprecedented. In *State v. Gumm*, 653 N.E.2d 253, 264 (Ohio 1995), during deliberations, the jury sent a two-part question to the trial judge, asking "Are the aggravating circumstances to Count I just the kidnapping and attempted rape, or do they also include the murder itself?" The jury was called into the courtroom, the court read its question aloud, and the judge responded as follows: "The answer to that is 'Yes.' Let me read you the instructions on that point." *Id.* The judge then

---

[4]Moreover, in *State v. Baker*, No. CA 86-06-041, 1987 WL 9749 (Ohio App. Apr. 13, 1987), an Ohio appellate court confronted the question of whether contemporaneous objection was required with regard to the trial court's rereading of an instruction in response to a jury question. The court discussed Rule 30, acknowledging that "[t]he case at bar is somewhat incongruous to the situation contemplated in the rule in that this involves a case where the jury has already retired for deliberations and has requested a rereading of an instruction." *Id.* at *2. After reviewing the rationale behind the rule (to "enable[] the court to correct an erroneous instruction or add that which was improperly omitted"), the court held that "the requirements of contemporaneous and specific objections, necessary before a jury retires to consider its verdict, are equally applicable to a rereading of an instruction or instructions requested by the jury after it has commenced it[s] deliberations." *Id.* at *3.

reread the instructions on aggravating circumstances, without any contemporaneous objection from defense counsel. The jury was sent back to continue its deliberations, and after it left the courtroom, the defense objected that the judge had indicated that aggravated murder was itself an aggravating circumstance for the purpose of determining penalty. In reviewing this case, the Supreme Court of Ohio stated:

> We note that the jury question itself was compound in nature and therefore contained a potential for ambiguity. As a result, the trial court's response ("the answer to that is yes") contained an element of uncertainty as to whether that answer meant, "yes, the aggravating circumstances are just the kidnapping and rape" or "yes, the aggravating circumstances include the murder itself." *We note that defense counsel's objection to the court's response was not made at a point in time at which the trial court could easily have corrected the ambiguity inherent in its response, and error, if any, might properly be deemed to have been waived.*

*Id.* (emphasis added). This case indicates that the rationale behind the contemporaneous objection rule – the timely correction of errors – should be taken into account in determining the import of a failure to object. If defense counsel felt that the judge's remarks improperly coerced Juror No. 3, counsel should have so indicated before the jury returned its verdict. His reliance on his previous discourse with the judge regarding the proper course of action, which resulted in (ostensibly) an agreement, is insufficient to preserve any objection to the supplemental instructions on appeal. What is clear from the record is that counsel objected to "pull[ing] one juror out of deliberations and interrogat[ing] them." The trial judge accommodated this objection, and instead addressed the entire jury. While the particular reference to calling "a mother or a boyfriend" may have hit home with Juror No. 3, there was nothing explicit in the judge's admonition regarding cell phones which mentioned

her by name or juror number, and defense counsel did not object to this admonition.

Gulertekin also contends that the court of appeals failed to provide a "clear and express" statement that its ruling regarding her juror coercion claim was based on the state procedural bar, conducted a "full-blown constitutional review, not plain error review," and spoke in terms of "reversible error." The requirement that a state court invoking a state procedural bar must provide a "clear and express" statement to that effect (the "plain statement" rule) originated in *Michigan v. Long*, 463 U.S. 1032 (1983), and was applied to the federal habeas context by *Harris v. Reed*, 489 U.S. 255 (1989). *Coleman*, 501 U.S. at 732-34. In *Coleman v. Thompson*, however, the Supreme Court made clear that "[a] predicate to the application of the *Harris* presumption [that state court opinions lacking such a "clear and express" statement of reliance on a state procedural bar do not preclude federal habeas review of the claim at issue] is that the decision of the last state court to which the petitioner presented his federal claims must fairly appear to rest primarily on federal law or to be interwoven with federal law." *Id.* at 735.

The court of appeals took up the issue of the trial court's jury instructions by first recounting the state-law precepts that:

> To preserve on appeal the issue of error in the instructions to a jury, "an appellant must cite an objection to the instruction on the trial record." *State v. Powers* (1995), 106 Ohio App.3d 696, 699. See also *State v. Underwood* (1983), 3 Ohio St.3d 12, 13 (in the absence of plain error, "the failure to object to improprieties in jury instructions, as required by Crim. R. 30, is a waiver of the issue on appeal"). Further, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage

of justice." *State v. Long* (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.

The court then embarked on a discussion of whether each facet of the trial court's supplemental instructions constituted plain error. Although the court of appeals mentioned "reversible error," and cited occasionally to federal law, the fact that it found the procedural problem (defense counsel's failure to object) paramount, and examined only whether this holding would constitute plain error (or manifest injustice), is sufficient to foreclose federal court review on habeas. The court began discussion of the issue by citing the contemporaneous objection rule, and returned to counsel's failure in this regard several times throughout the analysis. The mentions of "reversible error" can fairly be read to broach the question of whether there was, indeed, *any* error, let alone one which would constitute manifest injustice if uncorrected. This case properly falls under the rubric of *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989), wherein we observed:

> The [state court of appeals] did not conduct the sort of review of the jury instructions that presumably would have been undertaken had there been a timely objection to them; instead, the court inquired only whether affirmance of the conviction would "result in manifest injustice" because of the alleged instructional error. . . . We would be loath to adopt an exception to the "cause and prejudice" rule that would discourage state appellate courts from undertaking the sort of inquiry conducted by the [state] court, and we do not believe that the state court's explanation of why the jury instructions resulted in no manifest injustice can fairly be said to have constituted a waiver of the procedural default.

*See also Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("[W]e view a state appellate court's review for plain error as the enforcement of a procedural default").

Gulertekin's related assertion that the procedural bar at issue was not an "adequate and independent" ground, separate from federal law, relies on an unpublished Sixth Circuit opinion, *Knuckles v. Rogers*, No. 92-3208, 1993 WL 11874 (6th Cir. Jan. 21, 1993). In *Knuckles*, this court acknowledged Ohio's contemporaneous objection rule and the procedural default which resulted from a failure to object, but found that since the Ohio appellate court which reviewed the case conducted a plain error analysis, which gauges whether a person has been denied a "fair trial" (which, in turn, requires the application of federal constitutional law), the decision was "not independent of federal law." *Id.* at *3. We have previously held Ohio's contemporaneous objection rule to constitute an adequate and independent state ground. *See Hinkle*, 271 F.3d at 244 ("Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice"); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (objections to trial court's jury instructions are defaulted because "the court of appeals reviewed them only for plain error due to Seymour's failure to comply with Ohio's contemporaneous objection rule. . . .Controlling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."); and *Scott v. Mitchell*, 209 F.3d 854, 867 (6th Cir. 2000) ("[T]he Supreme Court [has] specifically found that default imposed for failure to object contemporaneously as required by Ohio's Rule 30 is an adequate and independent state ground").

In *Scott*, we criticized *Knuckles*, observing that:

In *Coleman*, the Court . . . very strongly implied its continued disapproval of the rule . . . ascribe[d] to *Knuckles*. As a preamble to its discussion of independent state grounds, the Court acknowledged that it had previously held Oklahoma's review for "fundamental trial error" before applying state procedural defaults "was not independent of federal law so as to bar direct review

because the State had made application of the procedural bar depend on an antecedent ruling on federal law." *Coleman*, 501 U.S. at 741. . . .The *Coleman* Court then distinguished that holding by observing simply that "*Ake* was a direct review case. We have never applied its rule regarding independent state grounds in federal habeas. But even if *Ake* applies here, it does Coleman no good because the Virginia Supreme Court relied on an independent state procedural rule." *Id.* The Supreme Court, then, does not find the mere reservation of discretion to review for plain error in exceptional circumstances sufficient to constitute an application of federal law.

. . . .

All in all, we think it is clear that *Knuckles*, an unpublished decision of this court, cannot provide persuasive authority to support a finding that the Ohio Supreme Court did not rely on an independent state procedural ground in disposing of Scott's challenge to the trial court's penalty-phase instruction on jury unanimity.

*Id.* at 867-68. *Scott* also noted that "*Harris* [*v. Reed*, 489 U.S. 255 (1989)] specifically instructed state courts that. . . . 'By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.'" *Scott*, 209 F.3d at 866-67 (quoting *Harris*, 489 U.S. at 264 n.10 (citations omitted)). The Ohio appellate court in this case invoked the procedural bar imposed by defense counsel's failure to lodge a contemporaneous objection sufficiently to preclude federal court review of this claim on habeas.

## 2. Remaining Claims

Gulertekin's remaining claims on habeas are also procedurally defaulted, in that she failed to raise them before

the state courts. Her first claim alleges ineffective assistance of counsel, for defense counsel's alleged failure to retain or consult with medical experts. While Gulertekin's petition for post-conviction relief made a general claim of ineffective assistance of counsel, it did not include facts or argument concerning this theory. At any rate, the state courts denied this petition, which did specifically allege her third and fourth claims on habeas (the government's alleged violation of the Vienna Convention on Consular Relations and prosecutorial misconduct), without reaching the merits, because it was filed late. In her briefs to this court, Gulertekin does not revisit the imposition of this procedural bar, but proceeds to argue that she can show cause and prejudice therefor.

## B.  Cause and Prejudice

Gulertekin contends that she can show cause and prejudice because any procedural default associated with her habeas claims is the result of ineffective assistance of counsel.

### 1.  Ineffective Assistance of Counsel – Failure to Consult Medical Experts

In this claim on habeas, Gulertekin asserts that her trial counsel was ineffective in that he did not employ a medical expert to investigate Patrick Lape's medical records and to refute the State's expert testimony. Because this claim was not presented to the state courts on direct appeal or in her post-conviction proceedings, it is barred. Gulertekin points out, however, that she was represented by her trial attorney during the direct appeal,[5] and that her attorney for the post-

---

[5]Thus, she contends, it could not have been expected that he would have raised the issue of his own ineffectiveness, nor was the evidence of record adequate on direct appeal to demonstrate the impact of his failure to retain medical experts. Under Ohio law, when the same attorney represents a defendant at trial and on direct appeal (as in this case), the appropriate forum in which to raise claims of ineffective assistance of trial counsel is in a post-conviction action. In such a situation, *res judicata*

conviction proceedings "rushed through" her petition (spending 5.25 hours on it) and filed it one day late. As to the prejudice element, Gulertekin presents the affidavit of Dr. Jan Leestma, a physician who provides consultation in forensic aspects of neuropathology, and whose opinions contradict that of the physicians called by the state. Dr. Leestma's ultimate opinion is that "the conclusions of these witnesses (that the injuries sustained by the infant could not have been caused unintentionally and could have occurred only within a temporal window of a few hours) cannot be established to a reasonable degree of medical certainty." Gulertekin also presents two recent articles calling into question whether only extreme violence results in shaken baby syndrome.

Gulertekin cannot use her post-conviction attorney's alleged ineffectiveness to establish cause for the procedural default, however, because

> [t]here is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings. . . .[The] attorney's error that led to the late filing of [the] state habeas appeal . . . . cannot be constitutionally ineffective; therefore [Gulertekin] must bear the risk of attorney error that results in a procedural default.

*Coleman*, 501 U.S. at 752-53 (internal citations and quotation marks omitted). Accordingly, Gulertekin cannot establish cause sufficient to excuse the procedural default on this claim.

### 2.  Juror Coercion

While Gulertekin presented this claim to the state courts on direct appeal, those courts found the claim procedurally

---

will not bar the ineffective assistance claim. *State v. Cole*, 443 N.E.2d 169, 171 n.1 (Ohio 1982).

defaulted due to trial counsel's failure to lodge a contemporaneous objection. As cause for this default, Gulertekin alludes only to "defense counsel's ineffective representation," presumably in failing to object to the allegedly coercive instructions to the jury. In *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000), however, the Supreme Court held that "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim," which can be procedurally defaulted. Gulertekin has never presented this claim (ineffective assistance of trial counsel) to the state courts. Once again, her petition for post-conviction review presented only a general ineffective assistance of counsel claim, and was dismissed for having been untimely filed. To the extent Gulertekin may assert ineffective assistance of her post-conviction counsel as cause for the procedural default of her claim for ineffective assistance of trial counsel, she is barred by the fact that she has no constitutional right to such counsel. Thus, she is unable to demonstrate cause for the procedural default of this claim.

### 3.    Violation of the Vienna Convention on Consular Relations and Prosecutorial Misconduct

These habeas claims are likewise defaulted because Gulertekin's attorney filed her post-conviction petition one day beyond the deadline, thus depriving the state court of jurisdiction. Gulertekin asserts that the cause for this default, however, is "clearly" ineffective assistance of counsel. Yet again, as Gulertekin had no right to counsel in her post-conviction proceedings, the alleged ineffectiveness of this counsel cannot constitute cause.

## C.   Actual Innocence

Finally, Gulertekin asserts that the district court erred in its finding that her claim of actual innocence did not excuse her procedural default. In so arguing, she relies on the tenet that, even without a demonstration of cause and prejudice, a

federal habeas petitioner may obtain review of defaulted claims by showing the failure to conduct such review will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *See also Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). In support, Gulertekin cites Ring's affidavit, in which Ring avers that, but for her coercion by the trial court, she would have voted to acquit Gulertekin. Ring also asserts:

> During deliberations, the jurors did not really decide whether the State proved Mrs. Gulertekin[] guilty beyond a reasonable doubt. Instead, one of the jurors posed the question as to whether any of us would hire Mrs. Gulertekin to baby-sit our children. We went around the room and offered our "vote" based on this question. All the jurors except me and another young juror said they would not hire Mrs. Gulertekin as a baby-sitter. After the other juror joined the majority, many of the jurors started pressuring me into voting to convict because they wanted to go home for the Thanksgiving holiday.

Gulertekin also reiterates the conclusions of Dr. Leestma, as contained in his affidavit, and the additional articles on shaken baby syndrome.

Under *Schlup v. Delo*, 513 U.S. 298, 324 (1995), a petitioner claiming actual innocence must "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." Further, "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. Actual innocence, moreover, "means factual innocence,

not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24 (1998). Thus, actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329.

The government challenges the propriety of even considering Ring's affidavit, citing Fed. R. Evid. 606(b), which provides that

a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict . . . or concerning the juror's mental processes therewith.

The rule contains an exception, however, that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.*

While Ring's allegations regarding how the jurors began their deliberations would clearly fall into the prohibited category under Rule 606(b), Gulertekin maintains that the trial judge's alleged coercive tactics in rendering the supplemental instruction regarding cell phones constituted an impermissible "outside influence" about which Ring may aver. *United States v. Tines*, 70 F.3d 891, 898 (6th Cir. 1995), however, makes clear that "[a] jury's interpretation and application of the court's instructions is a part of the deliberative process and [is] correctly excluded under Rule 606(b)." Thus, the trial judge's admonition to the jury instructing them to "go back and deliberate" and prohibiting the use of cell phones is not considered an improper outside influence. Moreover, while Gulertekin points out that the district court considered Ring's affidavit without mentioning

Fed. R. Evid. 606(b), that court concluded that she had not met the standards required by *Schlup* and *Murray*. That conclusion is correct.

To answer Gulertekin's reassertion of Dr. Leestma's affidavit, the government recounts the testimony of the three physicians who testified against Gulertekin at trial. Dr. Leestma's opinions merely undermine this testimony, and do not "show that it is more likely than not that no reasonable juror would have convicted [her] in the light of the new evidence." *Schlup*, 513 at 327. Thus, this evidence fails to meet the exacting standards of establishing actual innocence pursuant to *Schlup*.

Similarly unavailing is Gulertekin's argument pertaining to an affidavit by Ian Heyman, an attorney who avers that Buechner, the lead detective in Petitioner's case, "volunteered to [Heyman] that from the onset of his involvement [in the case], he knew that the injuries sustained by the Lape child were the result of an accident." Heyman also asserts that Buechner acknowledged the existence of a language barrier in Gulertekin's communications. This affidavit does not constitute new reliable evidence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup*, 513 at 324, sufficient to establish actual innocence.

**AFFIRMED**.