**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0575n.06

**09-1552**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

*Aug 16, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| WAYNE YOUNG, | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| JAN TROMBLEY, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Petitioner Wayne Young, a Michigan state prisoner, appeals the district court's denial of his petition for a writ of habeas corpus. Limited by a certificate of appealability, Young can raise only two issues before us: whether he was deprived of his right to a fair trial by the state trial judge's failure (1) to give a special cautionary instruction on accomplice testimony and (2) to declare a mistrial after dismissing one of the jurors prior to deliberations. Given our scope of review in habeas cases, we conclude that the district court did not err in denying relief. The state trial court's extensive instructions on witness credibility, although not specifically aimed at accomplice testimony, were constitutionally adequate to protect Young's right to a fair trial, and the court's denial of a mistrial did not result in error, constitutional or otherwise, in view of the instructions given the remaining members of the panel concerning the dismissed juror.

## **FACTUAL AND PROCEDURAL BACKGROUND**

Young was charged with two counts of second-degree murder, one count of assault with intent to commit armed robbery, one count of possession of a firearm during the commission of a felony, and one count of possession of a firearm by a person convicted of a felony.  Over the course of two days of trial, the prosecution introduced evidence against Young that the Michigan Supreme Court summarized as follows:

> [Young] shot and killed two people in an execution-style slaying while robbing a drug house in Detroit.  Among other evidence of guilt, the prosecution presented testimony from two witnesses whom [Young] now claims were his accomplices, Michael Martin and Eugene Lawrence.
>
> Martin testified that [Young] came to his house and asked him for a gun to rob someone.  Martin had no gun.  [Young] then spoke on the telephone to Martin's brother-in-law, Lawrence.  Martin did not hear their conversation. Martin then drove [Young] to Lawrence's house.  After they arrived, [Young] and Lawrence spoke in a back room away from Martin, who again could not hear their conversation.
>
> Lawrence testified that during this conversation, [Young] asked him for a gun because some man had threatened him.  [Young] did not mention to Lawrence any plan to rob a drug house.  Lawrence did furnish a gun to [Young].  Martin and [Young] then drove back to Martin's home. Martin went inside his home while [Young] walked off in the direction of a nearby drug house.
>
> [Young] later telephoned Martin, stating that he was planning to rob a drug house.  Martin hung up.  Later that day, [Young] visited Martin's home and admitted that he had shot the two victims in the head.  After [Young] left, Martin contacted Lawrence.  Martin and Lawrence then went to [Young]'s home.  [Young] told them that he was angry because he had killed the victims for only six rocks of crack cocaine.  [Young] called an unknown person and directed him to tell Martin where to find the gun.  [Young]

eventually directed Martin and Lawrence to a field near Martin's home where Martin found the gun.[1]

The police questioned Martin twice. During the second interview, he disclosed what had happened. The police then retrieved the murder weapon. Martin and Lawrence were never charged with a crime in connection with the murders.

In addition to the testimony of Martin and Lawrence, the prosecution presented other evidence of [Young]'s guilt. One witness testified that [Young] had also asked him for a gun. Another witness, Ronald Mathis, had seen [Young] in the drug house just before the murders occurred. At that time, [Young] offered to sell Mathis a gun. Mathis then left the premises. Upon his return approximately fifteen minutes later, Mathis discovered the victims' bodies and noted that [Young] was gone. Finally, a cigarette butt recovered at the murder scene contained deoxyribonucleic acid (DNA) material that matched [Young]'s DNA.

*People v. Young*, 693 N.W.2d 801, 803-04 (Mich. 2005).

The jury found the petitioner guilty of the charged offenses, and the trial court sentenced Young to concurrent prison terms of 45 to 70 years for the second-degree murders, 40 to 60 years for the assault, and two to five years for the felon-in-possession conviction. The court also sentenced Young to a mandatory consecutive two-year prison term for the felony-firearm conviction.

Young's attempts to overturn his convictions through the direct-appeal process were unsuccessful, as was his effort to challenge the jury verdicts through a collateral attack launched in accordance with state procedures. He then filed a petition for a writ of habeas

---

[1]The Michigan Supreme Court's summary of the trial testimony suggests that Young told Martin where to find the gun. In actuality, Martin's testimony indicates that the unnamed person on the phone directed Martin and Lawrence to the field where the gun was found.

corpus with the federal district court, raising the same nine constitutional claims he put

before the Michigan Court of Appeals and the Michigan Supreme Court. The district court

found each allegation of error to be without merit and denied the petition. *See Young v.*

*Trombley*, No. 06-CV-10977, 2009 WL 909563 (E.D. Mich. Mar. 31, 2009). The court did,

however, grant Young a certificate of appealability on two of the nine issues as making "a

substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and we

agreed to review both issues.

**DISCUSSION**

When "reviewing a district court's denial of a petition for a writ of habeas corpus, this

Court reviews findings of facts for clear error and questions of law *de novo*." *Stone v.*

*Moore*, 644 F.3d 342, 345 (6th Cir. 2011) (citing (*Haliym v. Mitchell*, 492 F.3d 680, 689 (6th

Cir. 2007)). Because Young's request for habeas relief is governed by the provisions of the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104-132, 110

Stat. 1214 (1996), *see Lindh v. Murphy*, 521 U.S. 320, 336 (1997), a federal court may not

grant the writ unless the state court adjudication on the merits either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As explained by the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000):

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

In deciding whether a state court ruling involved an "unreasonable application" of federal law, we do not judge whether the state court decision was erroneous or incorrect. Rather, a federal court may issue a writ of habeas corpus only if the state court's application of clearly-established federal law was objectively unreasonable. *See id.* at 409-11.

**Lack of Jury Instruction on Evaluation of Accomplice Testimony**

Young contends that he was denied due process of law by the trial court's failure to give a cautionary instruction to the jury regarding the unreliability of accomplice testimony. He concedes that his trial counsel failed both to request such an instruction and to object to the instructions that were given by the trial judge. In the face of the state's claim that such failures constitute a procedural default of the issue, the petitioner nevertheless argues that not insisting upon the instruction amounted to ineffective assistance of counsel and that such deficient representation by his lawyer excused his failure to comply with any state contemporaneous-objection rule.

Ordinarily, we would address the procedural-default issue at the outset of our analysis. In *Arias v. Hudson*, 589 F.3d 315, 316 (6th Cir. 2009), however, we skipped the procedural-default discussion and reviewed the petitioner's claim on the merits because it "present[ed] a more straightforward ground for decision." In this case, consideration of Young's ineffective-assistance-of-counsel justification for his procedural default requires us to determine whether trial counsel's performance could be termed deficient because an objection to the lack of an accomplice-testimony instruction would have been sustained had it been raised in a timely manner. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984) (to establish ineffective assistance of counsel, petitioner must show both deficient representation and prejudice therefrom). Because that inquiry necessitates delving into the actual merits of the claim, it makes sense here, as it did in *Arias*, to consider those merits in the first instance.

In support of his allegation that the trial court erred in failing to give, *sua sponte*, a cautionary instruction on accomplice testimony, Young cites the case of *People v. McCoy*, 220 N.W.2d 456 (Mich. 1974), *overruled in People v. Young*, 693 N.W.2d 801 (Mich. 2005). In *McCoy*, the Michigan Supreme Court was presented with a situation in which the defendant offered an alibi defense that was countered by the prosecution's presentation of testimony by McCoy's accomplice in crime. Recognizing the credibility dilemma facing the finders-of-fact, the trial court in that case offered an instruction directing the jury to treat alibi testimony with skepticism. As noted by the state supreme court, however, "[t]estimony of the comparable witness on the prosecution's side was not limited by any such cautionary

instructions." *Id.* at 459. Thus, although the state court recognized that "*a general instruction may[ ] conceivably substitute for a special cautionary instruction*, it is error to give only selective cautionary instructions. Defendant has the right to have a balanced presentation made to the jury." *Id.* (emphasis added). The court then announced that, after the release of the *McCoy* decision, "it will be deemed reversible error . . . to fail upon request to give a cautionary instruction concerning accomplice testimony and, if the issue is closely drawn, it may be reversible error to fail to give such a cautionary instruction even in the absence of a request to charge." *Id.* at 460.

There are myriad reasons why the holding in *McCoy* is not applicable to Young's situation so as to justify the grant of a writ of habeas corpus. Perhaps the most straightforward of them is simply that, even if Lawrence and Martin were to be considered accomplices of Young – a characterization that we find extremely doubtful – neither the United States Supreme Court nor this court has "requir[ed] accomplice instructions as a general matter." *Scott v. Mitchell*, 209 F.3d 854, 883 (6th Cir. 2000). Instead, the Supreme Court has consistently held that the only question to be answered in a habeas challenge to a jury instruction is "whether the ailing instruction [or the omission of a requested instruction] by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Furthermore, that instruction, or the absence of an instruction, "must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp*, 414 U.S. at 147).

As a result, when presented in *United States v. Carr*, 5 F.3d 986, 992 (6th Cir. 1993), with a challenge to a district court's failure to instruct the jury specifically "regarding the inherently questionable credibility of those witnesses who had earlier pled guilty to related charges," we noted:

> The court's instruction adequately informed the jury regarding the credibility of witness testimony, and so we are not troubled simply because the court chose not to explicitly highlight the credibility problems inhering in accomplice testimony. The instructions alerted the jury to the various considerations that it should take into account in weighing testimony, and it had an ample basis for rejecting the testimony of the accomplice witnesses if it had chosen to do so.

Similarly, in *Goff v. Bagley*, 601 F.3d 445 (6th Cir. 2010), another habeas petitioner argued, as does Young, "that the trial court erred in failing to give a specific instruction to the jury regarding the credibility of testimony by accomplices and informants and that . . . counsel was ineffective for failing to raise this issue . . . ." *Id.* at 469. Relying upon *Carr* and *Scott*, the *Goff* majority found that the instructions given in that case "adequately informed the jury regarding the credibility of witness testimony" and "alerted the jury to the various considerations that it should take into account in weighing testimony." *Id.* at 470 (internal quotation marks omitted). Those instructions, in pertinent part, provided:

> You are the sole judges of the facts and the credibility of the witnesses and the weight of the evidence. To weigh the evidence you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you apply in your daily lives. These tests include the appearance of each witness upon the stand, their manner of testifying, the reasonableness of their testimony, the opportunity they had to see, hear, and know the things concerning which they testified about, their accuracy of memory, their

- 8 -

frankness or lack of it, their intelligence, *their interest and bias, if any, together with all the facts and circumstances surrounding their testimony.* Applying these tests you will assign to the testimony of each witness such weight as you deem proper.

*You are not required to believe the testimony of any witness* simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

*Id.* at 470 (emphasis in original). Because those instructions thus satisfied the criteria set out in *Scott*, we concluded that "the failure to give a specific accomplice instruction did not violate Goff's constitutional rights." *Id.*

The jury instructions given at Young's trial contained the same directives as did the charge approved in *Goff*. Specifically, the trial judge informed Young's jury, in part:

As I said before, it is your job to decide what the facts of this case are, and you must decide which witnesses you believe, and how important you think their testimony is. You don't have to accept or reject everything a witness said. You are free to believe all, none or a part of a person's testimony.

In deciding which testimony you believe, you should rely on your own common sense and everyday experience. However, in deciding whether you believe a witness' testimony, you must set aside any bias or prejudice you may have based on race, gender or national origin of a witness.

There is no fixed set of rules for judging whether you believe a witness, but it may help you to think about these questions:

Was the witness able to see or hear clearly?

How long was the witness watching or listening?

Was anything else going on that may have distracted the witness?

Did the witness seem to have a good memory?

How did the witness look and act while testifying?

Did the witness seem to be making an honest effort to tell you the truth, or did the witness seem to evade the questions or argue with the lawyers?

Does the witness'[s] age and maturity affect how you judge his or her testimony?

Does the witness have any bias, prejudice or any personal interest in how the case is decided?

Have there been any promises, threats, suggestions or other influences that affect how the witness testified?

In general, does the witness have any special reason to tell the truth, or any special reason to lie?

All in all, how reasonable does the witness'[s] testimony seem when you think about all the other evidence in the case?

Sometimes the testimony of different witnesses will not agree, and you must decide which testimony you accept.

You should think about whether the disagreement involves something important or not, and whether you think someone is lying or simply mistaken.

People see and hear things differently, and witnesses may testify honestly but simply be wrong about what they thought they saw or remembered.

It is also a good idea to think about what testimony agrees best with the other evidence in the case.

However, you may conclude that a witness deliberately lied about something that is important to how you decide the case. If so, you may choose not to accept anything that witness said.

On the other hand, if you think the witness lied about some things but told the truth about others, you may simply accept the part you think is true and ignore the rest.

Because the totality of this "instruction both informs the jury regarding credibility and alerts the jury to what is properly considered when determining credibility," "the failure to give a specific accomplice instruction [also] did not violate [Young's] constitutional rights."

*Goff*, 601 F.3d at 470. Consequently, the Michigan state courts' determinations consistent with such a conclusion cannot be considered unreasonable.

## Effect Upon Jury of Dismissal of Venire Member

Young also contends that his conviction resulted from a verdict rendered by a tainted jury. Without dispute, the Sixth Amendment to the United States Constitution guarantees a criminal defendant an impartial jury to rule upon the question of guilt or innocence. *See Duncan v. Louisiana*, 391 U.S. 145, 147-49 (1968). "The question of whether a trial court has seated a fair and impartial jury is a factual one, involving an assessment of credibility." *Gall v. Parker*, 231 F.3d 265, 308 (6th Cir. 2000) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)), *overruled on other grounds in Bowling v. Parker*, 344 F.3d 487 (6th Cir. 2003). "On habeas review, this court inquires 'whether there is fair support in the record for the state courts' conclusion that the jurors [ ] would be impartial.'" *Id.* (citations omitted). In this case, the record contains such support for the conclusion that improper influences did not taint Young's jury and, therefore, that the state court determinations on this issue were not unreasonable.

Following a day of *voir dire*, the trial judge swore in a jury that included Juror Number 1, "a social worker for Detroit public schools." Like the others who were accepted by the defense and the prosecution to serve on the jury, Juror Number 1 did not indicate to the court that he had any connection with the defendant or with any of the witnesses scheduled

to appear at trial. On the second day of actual testimony, however, witness Ronald Mathis told the jury that one of the murder victims was his friend, Marquees Conley, known to him as "Crip" "[b]ecause [Conley] was handicapped, crippled." During the first recess that followed Mathis's testimony, the trial judge announced, "[W]e have received a note from one of the jurors, juror in seat no. 1, who states that he believes he knows one of the victims, Conley." The juror was then brought into open court and questioned by the trial judge and by the attorneys. According to the juror, when the list of possible witnesses was originally read during *voir dire*, Conley's name "just was a name at that point. It was a name." However, when Mathis further identified Conley as being "handicapped, crippled," the juror realized that Conley could well be a former student he had counseled seven years earlier. Even though Juror Number 1 had seen Conley during those counseling sessions for 30 minutes a day at least once a week, he was adamant that his prior interactions with Conley would not interfere with his "ability to be fair and unbiased in judging [the] case." Juror Number 1 also related that other jurors had seen him writing a note to the court and had asked him about it. He "told them [he] thought [he] knew one of the victims," but discussed nothing further about the matter with any juror.

At the conclusion of the questioning, the trial judge sent Juror Number 1 back into the jury room with the directive not to discuss with the other jurors "any personal things about that, anything that you learned outside of this courtroom." However, believing "that the process ha[d] been tainted" by the juror's relationship with the victim, defense counsel nevertheless moved for a mistrial. The trial judge denied that motion, but acceded to the

- 12 -

prosecution's suggestion that Juror Number 1 be dismissed and that the rest of the jury be questioned "to find out what taint the jury has had."

Over defense counsel's renewed motion for a mistrial due to a belief that the jury was irreparably tainted, the trial judge engaged in the following questioning of the remaining 13 jurors:

> All right.  Members of the jury, at this point as you can see an additional juror has been excused, and I am going to ask you a couple questions about that.
>
> Is there anyone on this panel who feels that this has changed their ability to be fair and impartial in any way?  All right.
>
> There are certain things that the court has previously instructed you on, and one of them is that you must not let sympathy or bias affect your judgment of the case in any way.
>
> Is there anyone who feels that they have heard any more information than was given to you during this trial about this case?  All right.
>
> * * *
>
> Members of the jury, information has been given to you that you may have heard that juror in seat no. 1 may know one of the people involved in the case.  Is there anyone on this panel who heard anything more than that?  Anything else, whatsoever?  Please raise your hand if there is anything else you heard.
>
> Is there anyone who heard anything more specific than that?
>
> Thinking about it yourselves, individually, is there anyone on the panel that may be affected by that in any way?
>
> Is there anyone who doesn't have total confidence in their ability to be fair and impartial in judging the facts of this case?  Thank you.

At the conclusion of the questioning, the trial court noted that Juror Number 1 had been dismissed and that, "by all indications[,] there has been no prejudice of the rest of the

panel." "A trial judge's finding on the impartiality of a juror or jury is a factual finding, presumed correct under § 2254 review unless [the petitioner] proves otherwise by convincing evidence." *Gall*, 231 F.3d at 334 (citations omitted). Because the record contains no evidence or other indication that any member of the jury was influenced by the fact that a dismissed juror *might* have previously known one of the victims, the district court appropriately denied habeas relief on this ground as well.

## CONCLUSION

The Michigan state courts determined that Young was not prejudiced either by the failure of the trial court to offer a cautionary instruction regarding accomplice testimony or by the dismissal of a juror who claimed that he might have known one of the murder victims seven years prior to trial. Those conclusions were neither unreasonable applications of law nor unreasonable determinations of facts. As a result, we AFFIRM the judgment of the district court denying habeas relief to the petitioner.